DECISION.
{¶ 1} Defendant-appellant Eric Lamont Levett was indicted for the murder of Carlos Manuel, also known as Monty. At trial, Levett argued that he killed Monty in self-defense. The jury rejected Levett's claim of self-defense and found him guilty of murder, along with two gun specifications. The trial court sentenced Levett to a total of eighteen years to life in prison. We affirm.
 I. Cold `N Quick {¶ 2} At Levett's trial, the state presented nine witnesses, and Levett called seven. Of the sixteen witnesses, eight were at the scene when Levett shot Monty. These eight witnesses told essentially the same story regarding the facts of the shooting.
 {¶ 3} On a sunny Sunday afternoon in October 2003, Levett, who was 17 years old, headed to the Cold `N Quick Drive-Thru in Avondale with his brother Deon Levett and their friend Christopher J. Williams. Both Levett and Williams sold drugs, which were supplied to them by Monty. Levett and Williams would sell the drugs and then give Monty money from the sales. On that Sunday afternoon, Levett owed Monty $75.
 {¶ 4} While Levett and the others were at the Cold `N Quick, Monty drove up and got out of his car. Monty approached Levett and said, "Give me my money." According to Williams's testimony at an earlier hearing, Levett replied, "I ain't paying you shit. I will pay you when I want to pay you." Monty then pushed Levett. Deon Levett began arguing with Monty, and Monty shoved him to the ground. Deon sustained a dislocated shoulder.
 {¶ 5} Deon testified that Monty said that he was going to get a gun from his car. Williams also testified that Monty said he was going to get his gun. Similarly, another witness, Reshon Mann, testified that, after shoving Deon to the ground, Monty said that he was going to get his gun.
 {¶ 6} Velita Wise had stopped at the Cold `N Quick that afternoon. She had her three-year-old son in the back seat of her car. She testified that, while she waited in her car for her order, she noticed a confrontation between several individuals, one of whom had a gun in his back pocket. The individuals were arguing and had their fists raised as if they were going to fight.
 {¶ 7} Wise testified that she received her order, pulled through the drive-thru, and drove into the parking lot, intending to drive away. While waiting to turn onto the street, Wise saw one of the individuals, Monty, hit Levett. Wise screamed at them, "Please don't fight. It's not worth it."
 {¶ 8} Wise testified that, after hitting Levett, Monty began to walk away. Then she noticed that Levett had a gun in his hand. Upon seeing the gun, Monty ran away from Levett towards Wise's car. Monty ran around the car, opened the front passenger door, and jumped in. He begged Wise to drive away. Wise testified that, before she could go anywhere, Levett fired one shot above her car at Monty and then two shots at him through the open driver's window. Levett then ran around the back of Wise's car and shot about four more times at Monty while he lay in Wise's car.
 {¶ 9} Charles Gardner, a Cincinnati police officer, was off-duty that Sunday afternoon and in his pickup truck stopped at a traffic light in front of the Cold `N Quick. While waiting for the traffic light, he noticed two individuals who looked like they were about to fight. The fight then appeared to break up, and the two men began to walk away in separate directions.
 {¶ 10} Gardner testified that while one of the individuals, Monty, walked around the back of Wise's car, the other individual, Levett, pulled a gun out of his waistband. Seeing the gun, Monty began to run. He continued around the back of Wise's car and along the passenger side. Levett chased Monty and fired one shot. Levett followed Monty around the back of Wise's car, and Monty jumped into the car. Levett then fired another four or five times at Monty as he lay in the car. Levett then put the gun back in his waistband and ran off.
 {¶ 11} Danielle Mason-Strauss was with several friends in line behind Velita Wise at the Cold `N Quick. She and her friends heard some commotion and realized there was an argument going on between several men. Mason-Strauss saw an individual, later identified as Monty, punch another individual, Deon, who fell to the ground. She then saw Levett pull out a gun and point it at Monty. Consistent with other testimony, Mason-Strauss testified that Monty ran away from Levett to the passenger side of Wise's car while Levett fired at him from the driver's side. Monty then dove into Wise's car. Levett followed Monty around the back of Wise's car and fired four more shots at Monty as he lay in the car.
 {¶ 12} Levett testified in his own defense. He claimed that Monty had punched Deon and then said he was going to get his gun. Levett testified that he pulled out his own gun, which he always carried with him for protection. According to Levett, "I was telling him: Ain't nobody going to jump me. Me and him going to fight one-on-one." Levett continued, "I pointed my gun at him, and then, he ducks, and ran around on the other side of the car * * *." Levett said that he then shot his gun until it was empty.
 {¶ 13} Levett further testified that he believed that Monty knew Wise and thought that Monty might have had a gun in Wise's car. Levett testified, "[I] [t]hought he was going to take my life, that's what I was thinking: either me or him." But on cross-examination, Levett admitted that he could have safely run away from the parking lot without shooting Monty. When asked why he did not just run away, Levett answered, "`Cause we was fighting. * * * He started it."
 {¶ 14} Levett disposed of the gun in the Ohio River and eventually went to Tennessee to stay with relatives for a few days. Several months later, back in Cincinnati but still eluding the police, Levett visited his mother at her house. Pamela Levett testified that Levett told her he had killed Monty out of fear. She testified as to what Levett had told her about the shooting: "[H]e was just in so much fear because he felt like if he hadn't taken him out, he was coming back to get him along with anybody else in our family along with anybody else." Pamela elaborated, "He just said when he fired, he proceeded to run after him. He fell. If he hadn't finished it, he was coming back to finish him. * * * He said he started [shooting] and stopped and started again."
 {¶ 15} Cincinnati paramedic Thomas J. Bayer was the first on the scene to administer aid to Monty. Bayer testified that, when he arrived, Monty was already dead. Hamilton County deputy coroner Dr. Daniel L. Schultz testified that Monty had been shot five times. Schultz testified that one bullet had gone through Monty's heart and lung, most likely causing death within a few minutes. Schultz testified that Monty's other gunshot wounds were serious, but not necessarily fatal.
 II. Jury Instructions — "Purpose" {¶ 16} In his first assignment of error, Levett argues that the trial court failed in several ways to properly instruct the jury.
 {¶ 17} Levett begins by arguing that the jury instructions included a conclusive, or mandatory, presumption. When instructing the jury on the meaning of "purpose," the trial court stated, "If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict deadly bodily harm, purpose to cause death may be inferred from the use of a weapon." Levett claims that the instruction allowed the jury to presume Levett had a purpose to kill because he used a firearm to defend himself. Levett contends that the presumption relieved the state of its burden to prove every element of the charged offense beyond a reasonable doubt.
 {¶ 18} In State v. Getsy,[1] the trial court used this same instruction. Getsy argued that the jury instruction created a mandatory presumption that violated the constitution. The Ohio Supreme Court decided that because the trial court used the word "may," the presumption was permissive and was "one the jury could accept, not one the jury was required to accept."[2] The court held that "there was no error, plain or otherwise."[3] Similarly, in Levett's case, we find no error in the trial court's instruction.
 III. Jury Instructions — Retreat {¶ 19} Levett next argues that the trial court erroneously instructed the jury that he had a duty to retreat.
 {¶ 20} The court instructed the jury first on the law of self-defense, stating, "To establish self-defense, the defendant must prove that he was not at fault in creating the situation giving rise to the assault, and he had reasonable grounds to believe, an honest belief, that he was in imminent danger of death or great bodily harm, and that his only means of retreat from such danger was by the use of deadly force, and he had not violated any duty to retreat to avoid danger."
 {¶ 21} The court then instructed the jury on the duty to retreat, stating, "The defendant had a duty to retreat if the defendant was at fault in creating the situation giving rise to the assault; or if the defendant did not have reasonable grounds to believe, an honest belief, he was in imminent danger of death or great bodily harm; and that his only means of escape from danger was by the use of deadly force."
 {¶ 22} Levett contends that he did not have a duty to retreat when doing so would have created an unreasonable risk of danger to himself or others. But the law does not require retreat when it is too dangerous. That is, if the only means of escape from danger is to use deadly force, and the other requirements are met, a person does not have to retreat, but is entitled to use deadly force in self-defense. The law does not require a person to retreat if it is certain that he or she will be shot. Contrary to Levett's argument, the trial court's instructions to the jury expressed this. Therefore, there was no error and no need for the trial court to specifically state that Levett did not have a duty to retreat if doing so created an unreasonable risk that he would be shot in the back.
 IV. Jury Instructions — Voluntary Manslaughter {¶ 23} Next, Levett argues that the trial court erred when it failed to instruct the jury on voluntary manslaughter.
 {¶ 24} Voluntary manslaughter is an inferior degree of murder, meaning that the elements of voluntary manslaughter are contained within those of murder, except for one or more additional mitigating elements.[4] Even though voluntary manslaughter is not a lesser-included offense of murder, the test for whether a trial court should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test applied when a defendant seeks an instruction on a lesser-included offense.[5]
 {¶ 25} A trial court is required to instruct the jury on a lesser-included offense "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser-included offense."[6] Thus, Levett was entitled to a jury instruction on voluntary manslaughter only if the evidence presented at trial reasonably supported both an acquittal on the murder charge and a conviction for voluntary manslaughter. The trial court had to view the evidence in the light most favorable to Levett when deciding whether to instruct the jury on voluntary manslaughter.[7]
 {¶ 26} The statute for voluntary manslaughter reads, "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *."[8]
 {¶ 27} The Ohio Supreme Court has held that the provocation must be "reasonably sufficient to incite the defendant to use deadly force. For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control."[9]
 {¶ 28} At trial, Levett claimed that he had acted out of fear, not anger. He testified that he had shot Monty in self-defense because he feared for his life.
 {¶ 29} But evidence supporting the privilege of self-defense — that the defendant feared for his and others' personal safety — does not necessarily constitute sudden passion or a fit of rage as contemplated by the voluntary-manslaughter statute.[10]
While self-defense requires a showing of fear, voluntary manslaughter requires a showing of rage, with emotions of "anger, hatred, jealousy, and/or furious resentment."[11] The Ohio Supreme Court has specifically held that "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage."[12]
 {¶ 30} Levett claims that he was enraged by Monty's assault on him and on Deon, and that he acted in a sudden passion or fit of rage. But Levett's own testimony established that Levett was fearful that Monty was going to get a gun and kill him. And Pamela Levett testified that Levett told her that he had killed Monty out of fear.
 {¶ 31} Viewing the facts in Levett's favor, we hold that there was insufficient evidence to support a conclusion that he was provoked into a sudden passion or fit of rage by Monty's actions. No rational jury could have concluded that the scuffle was enough to end in homicide. The trial court was correct in not instructing on voluntary manslaughter.
 {¶ 32} Finally, Levett argues that individual errors in the jury instructions resulted in a cumulative effect of reversible error. Because we have not found any errors in the jury instructions, there is no cumulative error — three times zero is still zero. Therefore, we overrule Levett's first assignment of error.
 V. Manifest Weight {¶ 33} In his second assignment of error, Levett argues that his conviction was against the manifest weight of the evidence.
 {¶ 34} A challenge to the weight of the evidence attacks the credibility of the evidence presented.[13] When evaluating a claim that a conviction was contrary to the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[14]
The discretionary power to reverse should be invoked only in exceptional cases "where the evidence weighs heavily against the conviction."[15]
 {¶ 35} As we have already discussed, to establish self-defense, a defendant must prove (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.[16]
 {¶ 36} Levett argues that he proved the elements of self-defense by a preponderance of the evidence. More specifically, Levett claims that he was justified in the preemptive use of deadly force. But it is well settled that one cannot defend himself with lethal force peremptorily.[17]
Rather, a person must first avail himself of any reasonable means of retreat, at least when attacked outside the confines of his own home or place of employment.[18]
 {¶ 37} Levett testified that he believed that Monty was going to get a gun and try to kill him. But Levett admitted at trial that he could have safely run away from the scene without shooting Monty. Furthermore, Levett's mother testified that Levett had told her that if he had not killed Monty right then, Monty would have attempted to later "get" Levett and Levett's family. But fear of an attack in the future does not justify peremptory use of deadly force. Levett was not justified in the use of deadly force in self-defense unless his only means of escape from the danger posed by Monty was the use of such force. And the dispute over $75 in past-due drug money — especially between people who were, before that day, doing business together — hardly seemed to call for such drastic action.
 {¶ 38} Our review of the record leads us to conclude that the jury did not lose its way when it found that Levett did not act in self-defense and when it found Levett guilty of murder. Accordingly, we overrule Levett's second assignment of error.
 VI. Character Trait {¶ 39} In his third assignment of error, Levett argues that the trial court erroneously excluded evidence of a relevant character trait of the victim.
 {¶ 40} Levett refers to the following exchange at his trial while he was testifying under direct examination. Levett's counsel asked, "[Y]ou said you knew about Monty's gun. Did you know anything about him being arrested a month before?" The state objected, and the trial court sustained the objection. There was no further questioning on the subject. Levett now claims that he was denied the opportunity to introduce evidence of his own state of mind at time of the offense resulting from his knowledge of Monty's prior violent conduct.
 {¶ 41} We have previously held that, for the purpose of proving the accused's state of mind at the time of an offense, testimony by the accused and by corroborating witnesses concerning the victim's reputation for violence and specific instances of violent conduct by the victim are admissible, provided that the testimony is shown to be relevant by proof that the accused had prior knowledge of the victim's reputation or conduct.[19]
 {¶ 42} Testimony by Levett concerning Monty's prior arrest, if Levett knew about the arrest and the arrest involved violence, would have been admissible to show Levett's state of mind at the time of the offense.
 {¶ 43} The state argues that Monty's prior arrest had nothing to do with his character. That may or may not be true, but we cannot now know, because the trial court sustained the state's objection, and the line of questioning ended.
 {¶ 44} Because there was no proffer and no indication whether the alleged arrest had anything to do with guns or violence, we conclude that the record does not demonstrate the claimed error.[20] Therefore, we overrule Levett's third assignment.
 V. Gruesome Photographs {¶ 45} In his fourth and final assignment of error, Levett argues that two of the photographs of Monty taken after he was shot were erroneously admitted into evidence, because they were gruesome, cumulative, and substantially prejudicial. Many times, this author has felt that photographs were too cumulative or too gruesome. Not here.
 {¶ 46} Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court and will not be disturbed on appeal unless the trial court has abused its discretion.[21] An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable.[22] A decision is unreasonable if it is unsupported by a sound reasoning process.[23]
 {¶ 47} In this case, the trial court had to determine whether the probative value of the photographs was outweighed by the danger of prejudice to Levett.[24] Our inspection of the photographs shows that they were not so gruesome as to produce an inflammatory reaction by the jury against Levett. They are some of the least gruesome we have seen.
 {¶ 48} Also, the photographs were introduced in connection with the coroner's testimony to help to explain and clarify the testimony. Furthermore, the only other admitted photographs of Monty taken after he was shot were taken some distance away from him and did not show his injuries.
 {¶ 49} We conclude that the trial court did not abuse its discretion when it determined that the photographs were not cumulative and that their admission was not prejudicial to Levett. Therefore, we overrule Levett's fourth assignment of error.
 {¶ 50} Having overruled all of Levett's assignments of error, we affirm the trial court's judgment.
Judgment affirmed.
Hildebrandt, P.J., and Gorman, J., concur.
[1] See State v. Getsy, 84 Ohio St.3d 180, 1998-Ohio-533,702 N.E.2d 866.
[2] Id. at 196.
[3] Id.
[4] See State v. Shane (1992), 63 Ohio St.3d 630, 632,590 N.E.2d 272.
[5] Id.
[6] See State v. Thomas (1988), 40 Ohio St.3d 213,533 N.E.2d 286, paragraph two of the syllabus.
[7] See State v. Campbell (1994), 69 Ohio St.3d 38, 47-48,630 N.E.2d 339.
[8] R.C. 2903.03(A).
[9] See State v. Shane, supra, at 635.
[10] See State v. Perdue, 153 Ohio App.3d 213,2003-Ohio-3481, 792 N.E.2d 747, at ¶ 12, quoting State v.Harris (1998), 129 Ohio App.3d 527, 535, 718 N.E.2d 488; see, also, State v. Tantarelli (May 23, 1995), 10th Dist. No. 94APA11-1618.
[11] Id.
[12] State v. Mack, 82 Ohio St.3d 198, 201, 1998-Ohio-375,694 N.E.2d 1328.
[13] See State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541.
[14] See id.; State v. Martin (1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717.
[15] See State v. Martin, supra.
[16] See State v. Cassano, 96 Ohio St.3d 94, 2002-Ohio-3751,772 N.E.2d 81, at ¶ 72.
[17] See State v. Vandergriff, 1st Dist. No. C-030068,2003-Ohio-7105, at ¶ 15, citing State v. Thomas,77 Ohio St.3d 323, 326-327, 1997-Ohio-269, 673 N.E.2d 1339.
[18] Id.; see, also, State v. Jackson (1986),22 Ohio St.3d 281, 283-284, 490 N.E.2d 893.
[19] See State v. Wetherall, 1st Dist. No. C-000113, 2002-Ohio-1613.
[20] See State v. Gilmore (1986), 28 Ohio St.3d 190, 193,503 N.E.2d 147.
[21] See State v. Hill (1967), 12 Ohio St.2d 88,232 N.E.2d 394, paragraph two of the syllabus.
[22] See Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219, 450 N.E.2d 1140.
[23] See AAAA Enterprises Inc. v. River Place Community UrbanRedevelopment Corp. (1990), 50 Ohio St.3d 157, 161,553 N.E.2d 597; State v. Echols (1998), 128 Ohio App.3d 677, 699-700,716 N.E.2d 728; see, also, State v. Chapple (1983), 135 Ariz. 281,297, 660 P.2d 1208.
[24] See State v. Hill, supra, at 91.