DECISION. *Page 2 
{¶ 1} Following a jury trial, defendant-appellant Joshua Fikes was convicted of the murder of DeAndre Preston, an accompanying firearm specification, and having a weapon under a disability. Fikes received an aggregate sentence of 22 years' to life imprisonment.
 {¶ 2} Fikes now appeals, raising eight assignments of error for our review. He argues (1) that he received ineffective assistance from his trial counsel; (2) that the trial court erred in failing to instruct the jury on the offense of voluntary manslaughter; (3) that his conviction was not supported by sufficient evidence; (4) that his conviction was against the manifest weight of the evidence; (5) that the trial court erred in preventing him from testifying about Preston's past violent behavior; (6) that the trial court erred in allowing the state to impeach him with a juvenile adjudication; (7) that the trial court erred in allowing a detective to state that he believed that Fikes was the aggressor in the confrontation with Preston; and (8) that the trial court erred in the imposition of sentence.
 {¶ 3} For the following reasons, the judgment of the trial court is affirmed.
 Factual Background {¶ 4} On June 7, 2005, leading into June 8, 2005, Fikes had been selling drugs on a street corner near DeAndre Preston's apartment in the Walnut Hills section of Cincinnati. According to Fikes, Preston had confronted him about selling drugs in that area. Following the confrontation, Preston had entered his apartment. Preston's girlfriend, Rachel Tobin, testified that Preston had told her that she needed to get her belongings together and leave. Preston had told her that "they out here *Page 3 
tripping," meaning that Fikes had been talking about what he would do to Preston and Preston's family.
 {¶ 5} According to Tobin, she leaned out the apartment's window and, seeing Fikes on the street below, asked him "why" several times. Tobin and Fikes argued back and forth. Fikes pulled out his gun and fired it into the air, instructing Tobin to have Preston come out and fight him.
 {¶ 6} Tobin testified that Preston had arranged for a bootleg cab to pick up her and their child. According to Tobin, as Preston was paying the cab driver, Fikes came running around the corner with a gun. The cab driver started to pull away, and Tobin saw both Fikes and Preston running around a bend in the road. Tobin jumped out of the cab and started running back down the street because she had heard gunshots. Tobin heard shooting back and forth and viewed Fikes pursuing Preston. Tobin saw Preston fall to the ground.
 {¶ 7} At trial, Fikes argued that he had shot Preston in self-defense. According to Fikes, he had returned to the corner near Preston's apartment after making a drug sale at a different location. When he returned, he saw Tobin driving down the street. Fikes made eye contact with Preston, and Preston told him to start showing respect for Preston's girlfriend. Fikes told Preston that he was not afraid of Preston, and the two agreed to fight. Fikes testified that Preston had told him to put down his gun, and he had complied. Fikes had approached Preston to begin the fight when Preston pulled out a gun, put it against Fikes' head, and pulled the trigger. Fikes heard a click, but the gun did not fire. Preston then used the gun to strike Fikes in the face. According to Fikes, he was able to pick up his own gun. Fearful of Preston and that Preston would attempt to take his gun, Fikes shot Preston twice. Fikes testified that he did not intend to kill Preston, but shot him because he had feared for his own life. *Page 4 
 {¶ 8} Gary Utz, Chief Deputy Coroner for the Hamilton County Coroner's Office, testified that he had performed an autopsy on Preston. Utz testified that Preston had died after receiving a gunshot wound to his chest. The bullet had injured his vena cava, causing extensive hemorrhaging in Preston's chest cavity. Utz further testified that because no stippling was present around the wound, the injury was consistent with the gunshot coming from a distance greater than one foot away.
 {¶ 9} Robert Michael Lenhoff, a firearms examiner for the Hamilton County Coroner's Office, testified that he had examined a .380-caliber handgun found at the murder scene. Lenhoff additionally examined an unfired cartridge case that had been removed from the chamber of the gun. The cartridge case had an apparent firing pin impression on it, indicating that a firing pin had struck the primer at the back of the cartridge. But Lenhoff was unable to determine when a firing pin had made such an impression. Nor could he determine whether the impression was made by the firing pin in the .380-caliber handgun he had examined, although the mark was consistent with this handgun. According to Lenhoff, if a handgun had its safety on, its firing pin could not have made such an impression.
 {¶ 10} Robert Carpenter, a criminalist for the Cincinnati Police Department, testified that he had found a .380-caliber handgun at the murder scene. The gun's safety was on when found, and the gun was neither cocked nor ready to be fired. It was found approximately 24 feet away from Preston's body.
 {¶ 11} Robert Randolph, a detective in the Cincinnati Police Department's homicide unit, testified about his investigation into Preston's homicide. On June 9, 2005, Randolph learned that Fikes had been apprehended in Kansas, and he and Detective Mike Drexelius flew to Kansas to obtain a statement from Fikes. Fikes' statements to Randolph and Drexelius largely conformed to the testimony that he later provided at trial. Randolph testified that, early on in the interview, Fikes had asked him if Preston's gun had been recovered. And Randolph had noticed an injury *Page 5 
to Fikes' face, which was consistent with Fikes' statement that Preston had struck him with a gun. According to Randolph, Fikes stated during the interview that he did not think that Preston's gun worked, or that it did not have any bullets in it. Randolph stated that Fikes revealed that he had fired his gun into the air near Tobin's apartment window because he was angry.
 Sufficiency and Weight {¶ 12} In his third and fourth assignments of error, Fikes argues that his conviction for murder was not supported by sufficient evidence and was against the manifest weight of the evidence because he had established the affirmative defense of self-defense.
 {¶ 13} In determining whether a conviction is supported by sufficient evidence, this court is not permitted to weigh the evidence, and instead we must view all the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the offense proved beyond a reasonable doubt.[1] In contrast, when reviewing the manifest weight of the evidence, this court sits as a "thirteenth juror."[2] We review the record, weigh the evidence, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created a manifest miscarriage of justice.[3]
 {¶ 14} To successfully rely on the affirmative defense of self-defense, a defendant must establish that "(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use *Page 6 
of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger."[4]
 {¶ 15} In this case, the record contains conflicting evidence on the first element of self-defense, whether the defendant was at fault in creating the violent situation. Fikes testified that the violent situation arose when Preston put a gun to his head and pulled the trigger. But Rachel Tobin testified that Fikes had come running at Preston with a gun in his hand.
 {¶ 16} The record also contains conflicting evidence on the second element of self-defense, specifically whether Fikes had a bona fide belief that he was in danger of death or great bodily harm. Fikes testified that he believed that Preston had wanted to kill him. But Detective Randolph testified that Fikes had stated, during his interview in Kansas, that he believed that Preston's gun either did not work or contained no bullets. Moreover, at the time that Fikes shot Preston, Preston no longer had a gun on his person.
 {¶ 17} The jury was entitled to weigh the credibility of the witnesses providing this testimony. Following our review of the record, we conclude that a rational trier of fact could reasonably have determined that Fikes had not proved the elements of self-defense by a preponderance of the evidence. Because Fikes did not prove self-defense, there was sufficient evidence to support his conviction for murder.[5]
We further conclude that the jury did not lose its way and create a manifest miscarriage of justice in finding Fikes guilty of murder, and that Fikes' conviction was not against the manifest weight of the evidence.
 {¶ 18} The third and fourth assignments of error are overruled. *Page 7 
 Ineffective Assistance {¶ 19} In his first assignment of error, Fikes argues that he received ineffective assistance of counsel.
 {¶ 20} To succeed on a claim of ineffective assistance, a defendant must establish that counsel's performance was deficient and that the defendant was prejudiced by the deficient performance.[6] Counsel will only be considered deficient if his or her conduct fell below an objective standard of reasonableness.[7] When reviewing counsel's performance, this court must be highly deferential and "must indulge a strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance."[8] To establish resulting prejudice, a defendant must show that the outcome of the proceedings would have been different but for counsel's deficient performance.[9]
 {¶ 21} Fikes first argues that his counsel was ineffective for making disparaging comments about Fikes in front of the jury. Fikes takes issue with several comments made by his counsel, including the following: that drug dealers were the "scourge of the country"; that drug dealers and other residents of Walnut Hills lacked the same morals as others; that Fikes was "unlikable" and "a drug dealer, stupid kid named Josh"; that he, counsel, could not believe the things that came out of Fikes' mouth during Fikes' testimony, despite months of trial preparation; and that Fikes was a cad.
 {¶ 22} When viewed in context of the entire closing argument, these comments by Fikes' counsel were part of a trial strategy and were not improper. The jury heard extensive testimony concerning Fikes' involvement with the sale of drugs. *Page 8 
And Fikes made several abrasive statements while testifying. For instance, he told the jury that he had told Tobin to "stay in a woman's place." He had additionally referred to a 40-year-old woman as "elderly," and he had mentioned being with another woman without his girlfriend's knowledge. Counsel's comments were designed to inform the jurors that they should not find Fikes guilty because they disapproved of his lifestyle or because they had been offended by his abrasive comments. Counsel's decision to address Fikes' lifestyle and comments was a strategic decision that we will not second-guess.
 {¶ 23} Fikes next argues that his counsel was ineffective for allowing prejudicial autopsy photographs, as well as a photograph of Preston with his small child, to be admitted into evidence without objection. The autopsy photographs at issue were not overly gruesome or bloody. They depicted Preston's gunshot wounds from various angles. Given that Fikes had asserted self-defense, and that consequently the jury had heard testimony concerning the angle and positioning of Preston's body at the time that he was shot, these photographs were relevant to aid the jury in determining the issue of self-defense. The photograph of Preston with his small child did not further the state's case in any way and should not have been admitted. But Fikes has not demonstrated that this photograph affected the outcome of the trial, and we conclude that counsel was not ineffective for failing to object to these photographs.
 {¶ 24} Fikes further argues that his counsel was ineffective for failing to confront Rachel Tobin with inconsistencies in her testimony. But the record does not support this allegation. Counsel thoroughly cross-examined Tobin. He pointed out to the jury that Tobin obviously desired to see the person who had shot the father of her children be punished, and he insinuated that Tobin had provided much more information while testifying before the jury than she had provided during her initial interview with the police. *Page 9 
 {¶ 25} Fikes next argues that his counsel was ineffective for questioning Fikes about when he had begun his drug-trafficking career, and for paving the way for the state to impeach Fikes with a juvenile adjudication. On direct examination, Fikes' counsel had asked him how long he had been selling drugs in Walnut Hills. Fikes stated that he had started selling drugs in October of 2004, shortly after he had quit his job at the SPCA. On cross-examination, the state questioned Fikes on this statement and impeached him with his juvenile adjudication for trafficking in cocaine in 2002.
 {¶ 26} Counsel was not ineffective for asking Fikes about how long he had been selling drugs. Throughout the trial, counsel had stressed to the jury the different lifestyle of drug dealers and how they responded to situations differently because of the dangerous nature of their job. Asking Fikes this question helped to establish how long he had been enmeshed in the drug culture.
 {¶ 27} Fikes further argues that this line of questioning made him appear to be dishonest because he had not revealed his juvenile adjudication on direct examination, and because counsel had previously told the jury that Fikes only had one prior felony conviction. But Fikes was not prejudiced by the introduction of his juvenile adjudication. Given that the jury had already been made aware of Fikes' prior adult felony conviction and had heard extensive testimony about Fikes' involvement with the sale of drugs on the night of Preston's murder, we conclude that neither the introduction of Fikes' juvenile adjudication nor the fact that Fikes had failed to initially disclose it affected the outcome of the trial.
 {¶ 28} In further support of his argument, Fikes relies on State v.Goldson.[10] In Goldson, this court reversed the defendant's convictions for rape and gross sexual imposition involving a seven-year-old after concluding that defense counsel had *Page 10 
rendered ineffective assistance by repeatedly mentioning the defendant's prior conviction for gross sexual imposition involving a child during opening statements and examination of the witnesses.[11] ButGoldson is easily distinguishable from the case at bar. Unlike defense counsel in Goldson, Fikes' counsel did not repeatedly mention his prior conviction and adjudication, nor did he question other witnesses about them. Moreover, in Goldson, the defendant's prior conviction was for the same crime that he had been on trial for. But although Fikes was on trial for murder, his prior conviction and juvenile adjudication were both drug-related. Thus, the concern that the jury would conclude that Fikes had merely been acting in conformity with his past behavior was not relevant.
 {¶ 29} Last, Fikes argues that his counsel was ineffective for failing to request a jury instruction on voluntary manslaughter when he had presented ample evidence of provocation.
 {¶ 30} Voluntary manslaughter is an inferior degree of murder.[12] A defendant on trial for murder "is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter."[13]
 {¶ 31} Voluntary manslaughter is defined in R.C. 2903.03: "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." The Ohio Supreme Court has determined that provocation is reasonably sufficient when it is "sufficient to arouse the passions of an ordinary person beyond the power of his or her control."[14] *Page 11 
 {¶ 32} In this case, Fikes testified that he had shot Preston because he was in fear for his own life. According to Fikes, he believed that Preston was trying to kill him, so he fired two shots at Preston to save himself. Notably, Fikes never stated that he had acted out of anger or passion.
 {¶ 33} As this court has previously stated, "evidence supporting the privilege of self-defense — that the defendant feared for his and others' personal safety — does not necessarily constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute. While self-defense requires a showing of fear, voluntary manslaughter requires a showing of rage, with emotions of `anger, hatred, jealousy, and/or furious resentment.'"[15]
 {¶ 34} On this record, we cannot conclude that the evidence supported an acquittal on the charged offense of murder and a conviction for voluntary manslaughter. Consequently, an instruction on voluntary manslaughter was not warranted, and counsel was not ineffective for failing to request such an instruction.
 {¶ 35} Fikes' first assignment of error is overruled.
 Jury Instructions {¶ 36} In his second assignment of error, Fikes argues that the trial court erred by failing to instruct the jury on voluntary manslaughter. But in the preceding assignment of error, we have determined that the record did not support an instruction on voluntary manslaughter. Accordingly, the trial court did not err in failing to so instruct the jury. Fikes' second assignment of error is overruled. *Page 12 
 Victim's Past Violent Behavior {¶ 37} In his fifth assignment of error, Fikes argues that the trial court erred by preventing him from testifying about his knowledge of Preston's past violent behavior.
 {¶ 38} Generally, "[a] defendant, when arguing self-defense, may testify about specific instances of the victim's prior conduct in order to establish the defendant's state of mind."[16]
 {¶ 39} In this case, Fikes testified about the relationship between Preston and Rachel Tobin. He stated that "there's been times I was standing outside and him up there abusing her." And he also said that "many times I was outside and they would be a crowd of us and he'd be up there abusing her. That's what we presumed to believe." The trial court sustained the state's objection to these comments, stating that "[w]e have to restrict the question to the time within the time frame of this situation, not what happened six months ago." We review the trial court's admission or exclusion of evidence for an abuse of discretion.[17]
 {¶ 40} The trial court should not have excluded this testimony solely on the basis of when the prior acts had taken place in relation to Preston's murder. In fact, Fikes' testimony did not make clear when these alleged acts of abuse had occurred. The trial court might have been informed of the timing of this alleged abuse during an unreported sidebar conference, but that is not apparent to this court on the record before us.
 {¶ 41} Nonetheless, we conclude that the trial court did not abuse its discretion in excluding this testimony. It is clear that Fikes never actually witnessed Preston abuse Tobin. As he stated, "that's what we presumed to believe." Given that *Page 13 
Fikes did not have firsthand knowledge of specific instances of Preston's past violent behavior, we conclude that the trial court did not abuse its discretion in excluding Fikes' testimony.
 {¶ 42} The fifth assignment of error is overruled.
 Impeachment with a Juvenile Adjudication {¶ 43} In his sixth assignment of error, Fikes argues that the trial court erred in allowing the state to impeach him with a juvenile adjudication.
 {¶ 44} Generally, juvenile adjudications are inadmissible at trial. But a juvenile adjudication may be used to impeach a defendant "on cross-examination or in rebuttal of defendant's testimony of the good quality of his juvenile years."[18]
 {¶ 45} In this case, the state properly impeached Fikes with his juvenile adjudication for trafficking in cocaine. Fikes testified that he had not begun selling drugs until 2004, when he was an adult. This implied that Fikes had not sold drugs as a juvenile. The state then used Fikes' adjudication for trafficking in cocaine to demonstrate that he had lied about when he had begun selling drugs.
 {¶ 46} Fikes further argues that, even if his juvenile adjudication was admissible, the probative value of the adjudication was heavily outweighed by the danger of unfair prejudice. We disagree because the jury had already heard extensive testimony concerning Fikes' involvement with the sale of drugs, specifically Fikes' prior adult conviction and the drug sales that he had conducted on the night of Preston's murder.
 {¶ 47} The trial court properly allowed the state to use the juvenile adjudication for impeachment purposes, and Fikes' sixth assignment of error is overruled. *Page 14 
 Evidence Rule 701 {¶ 48} In his seventh assignment of error, Fikes argues that the trial court erred in allowing Detective Randolph to testify that, in his opinion, Fikes had been the aggressor in the confrontation with Preston.
 {¶ 49} Detective Randolph made such a comment twice during his testimony. In the first instance, he stated, "In my opinion, based on what I had learned up to that point, Mr. Fikes was the aggressor in this situation. He fired his gun prior to the victim in this case coming outside, at the point when he challenged the victim through the window to come outside." Defense counsel objected to this statement. The trial court responded, "It's just his opinion, not evidence. Go ahead."
 {¶ 50} In the second instance, Randolph's comment was the result of the prosecutor questioning him about the charges that he had filed in this case. Randolph stated, "Our investigation led us to believe that the victim in this case was armed with a gun. Self-defense is a defense, I believe. In this particular case I believe that Mr. Fikes was the primary aggressor and starting this entire altercation between these two." Fikes did not object to this statement.
 {¶ 51} Fikes argues that these statements violated Evid.R. 701 because they concerned an ultimate issue and because Randolph had not witnessed the encounter between Preston and Fikes.
 {¶ 52} Evid.R. 701 concerns opinion testimony from lay witnesses, and it provides that "[if] the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." But *Page 15 
under Evid.R. 701, an opinion is not excludable solely because it embraces an ultimate issue.[19]
 {¶ 53} Fikes correctly argues that Randolph did not witness the altercation resulting in Preston's death. Instead, Randolph's opinion was based upon his investigation, which included a viewing of the crime scene and interviews with both Tobin and Fikes.
 {¶ 54} In this case, the trial court should not have admitted Detective Randolph's opinion testimony. His opinion "was not based wholly on his perceptions, but at least partly on information from * * * others."[20] Nonetheless, no prejudicial error resulted from the admission of this testimony. The state presented substantial evidence of guilt, and these few statements by Detective Randolph did not affect the outcome of the trial. Moreover, the trial court cautioned the jury that Randolph's opinion was just that, an opinion, and was not to be considered as evidence.
 {¶ 55} But we do caution against the introduction of such opinions in the future when the testifying officer has not witnessed the crime and the opinion is not based on the officer's own perceptions.
 {¶ 56} The seventh assignment of error is overruled.
 Sentencing {¶ 57} In his eighth assignment of error, Fikes argues that the trial court erred in imposing maximum, consecutive sentences. Fikes further argues that the trial court's application of State v. Foster[21]
violated the Ex Post Facto Clause and that *Page 16 
the trial court should have applied the sentencing scheme in effect at the time that he committed his offenses.
 {¶ 58} We have previously determined that the application ofFoster does not violate the Ex Post Facto Clause.[22] Accordingly, the trial court correctly applied Foster when sentencing Fikes. FollowingFoster, trial courts are no longer required to make findings or provide supporting reasons before imposing maximum or consecutive sentences.[23] Trial courts may now impose any sentence within the available statutory range.[24]
 {¶ 59} In this case, the sentences imposed fell within the available sentencing ranges. The trial court did not err in the imposition of sentence, and the eighth assignment of error is overruled.
 {¶ 60} Accordingly, the judgment of the trial court is affirmed.
Judgment affirmed.
PAINTER, P.J., and HILDEBRANDT, J., concur.
[1] State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[2] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[3] Id.
[4] State v. Thomas, 77 Ohio St.3d 323, 326, 1997-Ohio-269,673 N.E.2d 1339.
[5] See State v. Clardy, 1st Dist. No. C-060527, 2007-Ohio-4193, ¶ 20.
[6] Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052.
[7] Id. at 688.
[8] Id. at 689.
[9] Id. at 694.
[10] State v. Goldson (2000), 138 Ohio App.3d 848,742 N.E.2d 707.
[11] Id. at 852.
[12] See State v. Shane (1992), 63 Ohio St.3d 630, 632,590 N.E.2d 272.
[13] Id.
[14] Id. at 635.
[15] State v. Levett, 1st Dist. No. C-040537, 2006-Ohio-2222, ¶ 29
(internal citations omitted).
[16] State v. Carlson (1986), 31 Ohio App.3d 72, 508 N.E.2d 999.
[17] State v. Sage (1987), 31 Ohio St.3d 173, 510 N.E.2d 343, paragraph two of the syllabus.
[18] State v. Gamble (July 27, 1988), 1st Dist. No. C-870654.
[19] See Evid.R. 704. See, also, State v. Crotts, 104 Ohio St.3d 432,2004-Ohio-6550, 820 N.E.2d 302, ¶ 27.
[20] See State v. Webb, 70 Ohio St.3d 325, 333, 1994-Ohio-425,638 N.E.2d 1023.
[21] 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.
[22] See State v. Bruce, 170 Ohio App.3d 92, 2007-Ohio-175,866 N.E.2d 44.
[23] Id.
[24] Id. *Page 1