[Cite as *State v. McCray*, 2017-Ohio-2996.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-160272 |
| | | TRIAL NO. B-1406872 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| TRASHON MCCRAY, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 26, 2017


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Joshua A. Thompson* and *Demetra Stamatakos*, Assistant Public Defenders, for Defendant-Appellant.

**MYERS, Judge.**

{¶1} Defendant-appellant Trashon McCray appeals the judgment of the Hamilton County Common Pleas Court convicting him, after a jury trial, of murder, felonious assault, and two counts of having a weapon while under a disability. Finding no merit to his assignments of error, we affirm the trial court's judgment.

{¶2} On March 21, 2014, at the end of the school day, students walked from Dohn Community School on Essex Place to the bus stops on William Howard Taft Road. A large crowd gathered to watch a fight that had broken out at the intersection of Essex and Taft. McCray's younger brother, D.M., and other Dohn students were involved in the fight. Fourteen-year-old J.M. and 17-year-old D.L. were standing in the crowd when 19-year-old McCray, a Dohn student at the time, drove up and fired a gun at them. J.M. died as a result of his gunshot wounds. D.L. was shot multiple times in the legs, sustaining serious permanent injuries. Video cameras on a nearby city bus recorded the shooting.

{¶3} The vehicle that McCray was driving belonged to a family friend, Lakeisha Hicks. Hicks's teenaged son D.W. was the front-seat passenger. After the shooting, McCray drove around the block to McMillan Street and picked up Hicks's other son, 20-year-old Miniko, who got in the back seat. McCray drove back around the block to drop Miniko off near Essex and Taft, where J.M. and D.L. were still lying on the ground.

{¶4} Before Miniko got out of the car, he took the gun from McCray. And McCray told him, "I did what I had to do." Then McCray and D.W. drove off. As Miniko stood on Essex, he fired the gun into the remaining crowd, striking and injuring two people. Miniko ran away toward Taft Road, where he met up with his

other brother, 18-year-old Donyell Walker. Their aunt, Carletta Hayes, was driving by when she and her teenaged daughter spotted them. Hayes stopped to pick them up, and Miniko and Walker got into the back seat. As Hayes started to drive away, she was stopped by police. Police recovered the gun that McCray and Miniko had fired, a Kel-Tec semi-automatic pistol, from the back seat of Hayes's vehicle. Miniko and Walker were arrested.

{¶5} Shortly after the shooting, Janet Thomas, Hicks's coworker, saw Hicks and several carloads of teenagers in the parking lot of their workplace, two blocks away from Essex and Taft. Thomas recognized Hicks's vehicle. She saw one of the young men with Hicks enter the office building and go into the men's bathroom. He had been wearing a gray hoodie before he went into the bathroom, but was no longer wearing it when he exited.

{¶6} Five days later, police seized Hicks's vehicle. The following day, they photographed the vehicle and took lifts from it, attempting to obtain prints and gunshot residue. Testing revealed gunshot residue on the interior surface of the driver's door and D.W.'s palm print on the exterior surface of the left rear door. Lifts taken from the steering wheel and from the interior surface of the left rear door tested negative for gunshot residue.

{¶7} An arrest warrant was issued for McCray. McCray did not return to attend Dohn school, and police did not find him until ten months later. McCray was arrested at his girlfriend's apartment, where police recovered a Bryco firearm from a bedroom dresser.

{¶8} In an interview with police detectives about the events of March 21, 2014, McCray said that someone had called to tell him that his younger brother,

D.M., was in a fight. McCray told the police that he had been walking near the fight when he heard gunshots and then ran the other way.

{¶9} The detectives told McCray that they knew he was driving Hicks's vehicle and that they had him "on video." McCray asked if he could see the video, but the detectives refused. McCray then admitted that he had been in Hicks's vehicle, but denied that he had fired a gun.

{¶10} Later in the interview, McCray admitted that he had been driving Hicks's vehicle and that he had fired two or three shots near the crowd before driving away. McCray said that he stopped to pick up Miniko and then drove back around the block. He said Miniko took the gun and got out of the car. According to McCray, he heard four or five shots as he drove away, and he figured that Miniko had fired them.

{¶11} At some point, Hicks entered the car. And, according to McCray, they went with Hicks to her workplace to drop off her car. When asked if he had entered a building there to use the bathroom, McCray said he had. He said that he was so scared by firing a gun for the first time that he used the bathroom there to relieve his bowels.

{¶12} In recorded telephone calls from jail, McCray told his mother, "They got me." When she asked him for what, he responded, "What do you think?" He told her that the police told him that they had pictures of him at the scene and witness statements. When in one of the jail calls a friend warned McCray that police would lie to get him to incriminate himself, McCray claimed that the police had shown him pictures of him and the car at the scene, and pictures from a video recording.

{¶13} McCray was charged with murder and felony murder for the death of J.M., two felonious-assault offenses for the injuries to D.L., and having a weapon while under a disability. McCray was charged with a second weapon-under-disability offense for his possession of the firearm on the date of his arrest. The predicate disability for both weapons offenses was a 2012 juvenile adjudication for robbery.

{¶14} At trial, the parties stipulated to the predicate disability for the weapons offenses.

{¶15} In his defense, McCray testified at trial that on the day of the shootings, D.W. drove up in Hicks's vehicle. McCray told D.W. to scoot over, so that he could drive. As D.W. scooted over to the passenger's seat, McCray noticed a Kel-Tec handgun in the middle of the driver's seat. McCray said that D.W. grabbed the gun and set it in his lap. After receiving a call that his brother, D.M., was "getting jumped," McCray drove to the fight. McCray testified:

> I had pulled up next to the fight. And then as I was trying to maneuver to pull up to Essex, I just heard gunshots from behind my head. So then I started to drive off.
>
> * * *
>
> I guess, like, [D.W.], maneuvered, like - - I don't know how he maneuvered to get behind me to shoot out the window. I just know he maneuvered behind me and he was sitting back down as we pulled away.

{¶16} McCray said that he did not ask D.W. why he had fired the gun. McCray said that when he drove around the block, he stopped to pick up Miniko. Miniko jumped into the back seat and asked for the gun. According to McCray,

Miniko grabbed the gun from D.W. McCray said that when they drove back around the block, he did not see anyone who had been shot, and he assumed that D.W. had fired the gun into the air.

{¶17} McCray testified that then he saw Hicks, so he pulled over. McCray got into the backseat, and Hicks drove to her workplace. McCray said that he had asked to use the bathroom there, but was told that he was not allowed to be in the building.

{¶18} McCray acknowledged that his trial testimony differed from what he had told the detectives. He said that in his interview with police, he had been trying to be loyal to Hicks and D.W., and not implicate them. McCray admitted that, despite what he told his friend in the recorded jail call, the police had not shown him witness statements, photographs or video recordings. He admitted that the Bryco gun recovered from the apartment was his.

{¶19} At the conclusion of the trial, the jury found McCray guilty of all the offenses. For sentencing purposes, the trial court merged the felony-murder count with the murder count, and merged the second felonious-assault count with the first felonious-assault count. The trial court imposed an aggregate term of 38 years to life. McCray now appeals.

### First Assignment of Error: McCray's Prior Juvenile Adjudication

{¶20} In his first assignment of error, McCray argues that the use of a prior juvenile adjudication to establish the disability element of his weapon-under-disability convictions under R.C. 2923.13(A)(2) violated his right to due process. He contends that, pursuant to *State v. Hand*, ____ Ohio St.3d ____, 2016-Ohio-5504,

____ N.E.3d ____, "it was unconstitutional to use his juvenile adjudication as the basis" for his weapon-under-disability convictions. He argues that this due-process violation was further compounded because evidence of his prior juvenile adjudication would not otherwise have been admissible at trial.

{¶21} In *State v. Carnes*, 1st Dist. Hamilton No. C-150752, 2016-Ohio-8019, we recently declined to extend the application of *Hand* to bar the use of a juvenile adjudication to prove the disability element of a weapon-under-disability charge under R.C. 2923.13(A)(2). Therefore, we hold that McCray's right to due process was not violated by the use of his prior juvenile adjudication to prove the disability element of his weapon-under-disability convictions. *See Carnes*; *see also State v. Hudson*, 7th Dist. Mahoning No. 15 MA 0134, 2017-Ohio-645. And, as McCray implicitly concedes, the disposition of the due-process issue renders moot his argument that without the weapon-under-disability offenses, evidence relating to his adjudication would be inadmissible other-acts evidence under Evid.R. 404(B). We overrule the first assignment of error.

### Second Assignment of Error: Voir Dire

{¶22} In his second assignment of error, McCray argues that he was denied his constitutional right to an impartial jury because, during voir dire, "the state excessively detailed the facts and evidence, and asked prospective jurors if they could agree with the theory of prosecution." During voir dire, McCray objected only one time, to the prosecutor's phrasing of a question, and he did not renew his objection upon the prosecutor's restatement of the question.

{¶23} The scope of voir dire lies within the sound discretion of the trial court. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 28. Voir dire may constitute reversible error only upon a showing that the trial court abused its discretion. *State v. Williams*, 79 Ohio St.3d 1, 6, 679 N.E.2d 646 (1997). In this case, we apply the even more deferential plain-error standard because McCray did not object to the questioning by the state. *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 73.

{¶24} The appellant bears the burden of demonstrating that a plain error affected his substantial rights. *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14. The appellant must show that an error occurred, that the error was an obvious defect in the trial proceedings, and that the error affected the outcome of the trial. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶25} *A. Outline of the facts.* First, McCray claims that, during voir dire, the prosecutor excessively described the facts and evidence of the case. He points to the following remarks by the prosecutor:

> The school had let out a short time before. There was a large number of people around. It developed into a fistfight, with some of the people, and the allegation is that the defendant, this man right here, Trashon McCray, shot and killed a 14-year-old person and shot and injured another teenager at the scene.

He then left the scene, and he wasn't arrested until January of 2015, around nine, ten months after the incident. Have any of you heard of the incident other than what I just told you? I think it got some attention just because it was a 14-year-old that was shot and killed, basically, at or near a school ground.

{¶26} A prosecutor has a right to give an overview of the facts of the case and of those involved in order to ascertain whether prospective jurors know anything about the offense. *State v. Tyler*, 50 Ohio St.3d 24, 32, 553 N.E.2d 576 (1990). While jurors must be impartial, they need not be completely ignorant of the facts and issues involved in a case to be qualified as jurors. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 38. In this case, the prosecutor explained that the case had gotten media attention, so he reasonably attempted to learn what, if anything, prospective jurors knew about the case. His statements and questions were designed to do so. The trial court did not err by allowing the prosecutor to outline the case's facts and evidence.

{¶27} *B. Plea bargains with state witnesses.* McCray also asserts that the trial court erred by allowing the prosecutor to explain the state's reasons for giving plea deals to some witnesses. The prosecutor told prospective jurors that Miniko shot two people with the same gun that McCray had used, and that Miniko's brother, Donyell Walker, had assisted in Miniko's getaway. The prosecutor said that the state had offered plea deals to Miniko and Walker in exchange for their "truthful testimony" so the state could make its case against McCray, "who we feel is the most serious offender" and the "hands-on killer."

9

{¶28} A prosecutor may not express his or her personal belief or opinion as to the defendant's guilt. *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). So it was improper for the prosecutor to refer to the prosecution team's belief that McCray was guilty and that he was the worst offender. Even though the prosecutor's remarks were improper, McCray has failed to demonstrate plain error because the evidence of his guilt was overwhelming. *See Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, at ¶ 16.

{¶29} A prosecutor may validly explore the possibility that prospective jurors might be predisposed to discount the testimony of inmate witnesses. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 124. In other words, a prosecutor may try to " 'draw the sting' from the unfavorable fact that [some of] the state witnesses were accomplices and had plea-bargained to minimize their criminal exposure." *State v. Lundgren*, 73 Ohio St.3d 474, 484, 653 N.E.2d 304 (1995), quoting *Tyler*, 50 Ohio St.3d at 34, 553 N.E.2d 576. In this case, the prosecutor reasonably explored the possibility that prospective jurors might be disinclined to believe the testimony of witnesses who were accomplices in the offenses.

{¶30} *C. Discussing victim responsibility.* McCray asserts that the prosecutor improperly speculated about why J.M. was standing near the street fight on the day he was shot. McCray emphasizes the prosecutor's remark that J.M. "may have been just meeting some friends." He does not say how he was prejudiced by this particular remark. When read in its full context, it is clear that the prosecutor wanted to learn if prospective jurors would blame the victim for putting himself near the scene of a fight, no matter what led to the victim's being there:

As far as victim responsibility, the evidence is going to show that the victim was - - he didn't go to that school, he went to Withrow, and he went down to the Dohn School after Withrow, and he may have been just meeting some friends; he may have heard that there was going to be a fight and just went down there to see what was going on, because I think word was out that something was going to happen that afternoon down at the school.

Does anybody feel that, you know, because he went to that situation, it basically put himself at the scene when he really didn't need to be there, that somehow he deserved what happened or somehow that absolves the shooter for doing a voluntary and intentional act that caused his death?

Anybody feel that way, that he wasn't at the school, he shouldn't have been there, even if he was meeting some buddies or wanted to see kind of what was going on?

The prosecutor was attempting to determine whether prospective jurors could fairly weigh the evidence. *See Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 57. The trial court did not err in allowing the prosecutor to inquire into potential bias through this line of questioning.

{¶31} *D. Difficulty of producing eyewitnesses.* McCray also contends that the trial court improperly allowed the state to persuade prospective jurors to agree with its "theories of prosecution" with respect to the difficulty of producing an eyewitness to the shooting. The prosecutor asked if any prospective jurors expected

numerous witnesses to identify McCray as the shooter, given the large number of people in the area at the time of the incident. Prospective Juror 2 responded:

> No, because when you're involved in a situation like that, you're not always looking at what's going on. You're looking around at other people, like, chatting, and then you're, like, what happened, like, at a baseball game, what'd I miss.

Then the prosecutor asked, "So you might hear something happen, hear some shots or commotion, but by the time you look around, it's too late?" The juror responded, "Yeah."

{¶32} Then the prosecutor asked the panel:

> Does everybody understand what [Prospective Juror 2] is saying? I think that was a very good response, and I think that's what happened in this case and the shots happened from a car, so it wasn't from somebody that was in the crowd, which makes it even harder to see the person that did it.
>
> Does everybody agree with that theory? Are you okay with that?

{¶33} A review of the record demonstrates that the prosecutor was neither espousing a theory of the state's case nor seeking agreement on a theory. Instead, he was questioning whether prospective jurors could fairly assess and weigh the evidence, given the circumstances. *See Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 57.

{¶34} *E. Implying that an eyewitness identified McCray.* McCray also contends that the trial court improperly allowed the prosecutor to ask prospective jurors:

> Does everybody understand the thought that even if [the police] may have gotten the statement from somebody that maybe identifies Mr. McCray or has some relevance to the case, that it's another matter almost two years later to try to get them to come to court?

This question followed the prosecutor's line of questioning about why witnesses might not want to come forward to the police. Prospective Juror 5 responded that it could result from a fear of reprisals. Then the prosecutor said, "Okay. That if you're a student or may know the shooter or his people may come after you if you let it become known that you're a witness?" And the juror responded affirmatively. The prosecutor then said:

> [E]verybody understand what [Prospective Juror 5] said? Everybody understand that thought, that when you've got uniformed police at a scene or homicide detectives, that people just don't go up to them and say, hey, I saw what happened because they are kind of fronted out maybe by other people that are in the crowd?

The prosecutor's suggestion that a witness who had identified McCray had refused to testify at trial was improper. *See Lott*, 51 Ohio St.3d at 166, 555 N.E.2d 293. However, the error did not rise to the level of plain error because the outcome of the trial was not affected. *See Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, at ¶ 16. And the trial court properly instructed the jury that the statements by counsel are not evidence.

{¶35} *F. Comments on evidence.* McCray asserts that the prosecutor improperly told the jury that the prosecution would use ballistic and video evidence at trial, but not DNA evidence. The prosecutor stated:

This case, though, does have important, we call it ballistic evidence. With that, what that means is it involves guns, bullets, casings, those type of things.

Is everybody good with scientific evidence, and the experts have the right training and background, and you believe that the procedures the experts did were properly done?

You can't really see faces or identities, but you will see it from a little bit of a distance, the actual murder of [J.M.], and the wounding of [D.L.], so there is some video of the offense. Because that is probably - - in this case the most important piece of evidence is the video. And you will consider that video if it is admitted into evidence. Everybody good with that?

* * *

Okay. So there's a lot about DNA exonerations. In this case there was DNA taken, but it was never really followed up on because once the defendant admitted that he was the shooter, you know, the lab stuff kind of stopped. Do you understand that?

McCray does not say how the remarks were improper or what prejudice he may have suffered. We find that the trial court did not err in allowing them. *See Payne* at ¶ 16.

{¶36} *G. Comments on the defense.* McCray contends that the prosecutor should not have made comments about what his defense would be. The prosecutor stated:

Every case is unique. There is no exception. I'm not sure really where this is going to fit in the scheme of things. Some cases, the identity of the defendant is known, and those kind of cases might be like a self-defense case or a consent type of a case, and that comes up where if it's like a murder, or let's say a rape, so a defendant in a murder says I did it, but I had to do it or else myself or some other innocent person would be killed; I had no choice, it was self-defense.

Or in a rape there's no issue that sexual conduct occurred, both the victim and the defendant are saying yes, there was sex, but the victim is saying that it was force and the defendant is saying it was consent, so there's really no issue that something occurred; it's just what the state of mind of the person was.

So, basically, the identity of the person is agreed. The issue is what their intent is. I don't really know what the defense is in this case. I don't believe it's gonna be a self-defense type of situation.

I don't think that's gonna come out. I don't think that's gonna be relevant to the issues in this case. If it is, you'll follow the law the Judge gives you on this issue? It's a very specific rule. Again, I don't think it's going to come up, but if it is, everybody will follow the law that [the trial judge] gives you on that?

15

The prosecutor ultimately was asking whether prospective jurors could follow the trial court's instructions on the law. While it is improper to comment on a defendant's failure to testify, it is not improper to outline potential legal defenses and to ask prospective jurors whether they will follow the law. A prospective juror who indicates that he or she will not follow the law may be challenged for cause. R.C. 2313.17(B)(9). Therefore, parties may ask prospective jurors if they will follow the law. *See, e.g., State v. Treesh*, 90 Ohio St.3d 460, 465, 739 N.E.2d 749 (2001). The trial court did not err by permitting the question.

{¶37} *H. McCray's statements to police.* McCray contends that the trial court should not have allowed the prosecutor to ask if prospective jurors agreed that it was important to hear McCray's statements to police, because the prosecutor's question left him no choice but to testify at trial. The prosecutor said:

Another important part of the case is actually the defendant's own statements to the Cincinnati Police. And I would say other than the video that I talk about as being the most important part of the case, Trashon McCray's own statements to homicide detectives are probably the second most important part of this case.

Does everybody agree that what Mr. McCray told the police after his arrest for the murder, would that be important to you to know what he says about what his role was in this? Would everybody agree that's important to hear his side of the story?

{¶38} The prosecutor may properly refer to and inquire about statements that will be admitted into evidence. *State v. Sneed*, 63 Ohio St.3d 3, 16, 584 N.E.2d 1160 (1992). He may not comment on the defendant's exercise of his constitutional

16

right not to testify. *State v. Mapes*, 8th Dist. Cuyahoga No. 47191, 1984 WL 5285, *13 (Oct. 25, 1984).

{¶39} Here, any comments regarding McCray's statements to police were permissible. The comment seeking agreement that it would be important to hear McCray's side of the story would have been improper if considered in a vacuum. The prosecutor may not comment on the defendant's failure to "tell his side of the story" at trial. *State v. Heller*, 10th Dist. Franklin No. 01AP-648, 2002 WL 338143, *4 (Mar. 5, 2002). Taken in context, however, we find that this comment related only to McCray's prior statements to police and was not commentary on his testimony, or lack thereof, at trial. *See State v. Wilson*, 74 Ohio St.3d 381, 387, 659 N.E.2d 292 (1996).

{¶40} *I. McCray's jail calls.* McCray asserts that the trial court improperly allowed the state to present him as indigent and unable to make bond, "thus making it clear he was being held in jail." The prosecutor told prospective jurors that the state might present recordings of calls that had been made from jail. The prosecutor stated:

> And what that means is that when somebody's arrested and charged with a crime like murder and they don't have enough money to make bond, they are in the jail, and they have access to phones.
>
> And there's notice to the people that their calls are recorded and those calls are available to law enforcement to listen to those calls after they are made.

And we may or may not use those in this case, but does anybody have a problem if we use jail calls to Trashon McCray to play to you about some of the things he said about the situation?

{¶41} While generally it is error to comment on a defendant's being in jail, when taken in context, the prosecutor was attempting to determine whether jurors would fairly consider evidence of recorded calls. The prosecutor explained:

The reason I bring that up is I had a jury once where a juror felt that was unfair, that because he's locked up that he's - - it's an unfair advantage to the State to be able to record his calls from a correctional facility; that somehow puts him at a disadvantage if he wants to use the phone.

Does anybody feel that way, that somehow it's really not fair to him to listen to his calls and play those somewhere down the road if they are relevant to this case? Everybody good with that? Okay.

We hold that, even if the trial court erred by allowing the prosecutor to mention that the calls were made from jail, it was not plain error. *See Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 73. We overrule the second assignment of error.

### Third Assignment of Error: Prosecutorial Misconduct

{¶42} In his third assignment of error, McCray argues that his right to due process was violated by prosecutorial misconduct. Generally, prosecutorial misconduct will not provide a basis for overturning a conviction unless, on the record as a whole, the misconduct can be said to have deprived the defendant of a fair trial.

*Lott*, 51 Ohio St.3d at 166, 555 N.E.2d 293. The test for whether prosecutorial misconduct mandates reversal is whether the prosecutor's remarks or actions were improper, and, if so, whether they prejudicially affected the substantial rights of the accused. *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 45. In most of the instances cited by McCray, he failed to object, so his challenges to the prosecutor's conduct are reviewed for plain error. *See id.*

{¶43} *A. Voir dire.* McCray restates his arguments with respect to the prosecutor's voir dire. As we have discussed in our resolution of the second assignment of error, no plain error occurred in voir dire. *See Thompson* at ¶ 163.

{¶44} *B. Leading questions.* McCray contends that the prosecutors "asked improper leading questions with impunity throughout trial." McCray objected to just one of the challenged questions. In that instance, the prosecutor asked if the witness remembered McCray's having made a particular statement about the gun "at or about the time that you took it from him." Defense counsel objected, and the trial court asked the witness whether he had remembered any conversation with the defendant. The witness clarified that McCray had not made the statement until after the witness had taken the gun. Because the trial court stepped in to restate the question so that it was not leading, McCray cannot demonstrate that prejudice resulted from the question. *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 172.

{¶45} We have reviewed the remaining questions that McCray has challenged as leading and conclude that the trial court did not commit plain error by allowing them. *See State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 264.

{¶46} *C. Closing argument.* McCray argues that the prosecutors made prejudicial comments and incorrect statements during closing argument. A prosecutor is entitled to a certain degree of latitude in closing argument. *State v. Grant*, 67 Ohio St.3d 465, 482, 620 N.E.2d 50 (1993). A prosecutor may draw reasonable inferences from the evidence presented at trial and comment on those inferences in closing argument. *Treesh*, 90 Ohio St.3d at 466, 739 N.E.2d 749. We review a prosecutor's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 198. In this case, except for two instances, McCray failed to object and thus forfeited all but plain error. *See State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 109.

{¶47} After reviewing the closing arguments in their entirety, we are convinced that the majority of the challenged remarks were fair commentary based upon reasonable inferences from the evidence. *See Treesh* at 466. To the extent that any imprecise statements about the evidence were made, the trial court addressed the issue by instructing the jury that the arguments of counsel were not evidence and that the jurors were the sole judges of the facts. *See Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 211. While we do not specifically address each of the challenged remarks, we address certain representative examples.

{¶48} *i. Misstatement of the evidence.* McCray points to the prosecutor's inaccurate statement that gunshot residue had been found on the steering wheel of Hicks's vehicle. The trial court sustained a defense objection to the comment and instructed the jurors that they would determine what the evidence was. The prosecutor then clarified that the residue had been found on the driver's side of the

vehicle. In light of these corrective actions, McCray has failed to demonstrate that these remarks were prejudicial. *See Pickens* at ¶ 128.

{¶49} McCray also contends that the prosecutor improperly stated that DNA evidence "would have been masked or destroyed by the three other people who touched [the gun] after him." Although there was no evidence supporting the prosecutor's assertion, this comment was in response to the defense argument that no DNA evidence connected McCray to the gun, and it did not result in plain error. *See Diar* at ¶ 211.

{¶50} Next, McCray asserts that the prosecutor inaccurately stated that he had fired the gun "at least six" times, when, according to McCray, the videotape "audibly demonstrate[d] five shots" had been fired. However, this was fair commentary, given that D.L. had testified that he had heard "more than seven" gunshots. *See Treesh*, 90 Ohio St.3d at 466, 739 N.E.2d 749.

{¶51} McCray also argues that the prosecutor misstated his testimony by saying that he had testified that "nobody was on the ground," when McCray's testimony had been that he did not see people on the ground. The prosecutor's remark was a reasonable inference from the evidence. *See id.*

{¶52} McCray asserts that the prosecutor misstated evidence by arguing that McCray "g[ave] Miniko the gun," because Miniko testified that he took the gun from McCray. This was fair commentary on the evidence, since Miniko had responded affirmatively to the question, "[D]id you say you got it from [McCray]?" Additionally, Miniko admitted that he had told the police that someone had given him the gun. *See id.*

{¶53} *ii. Personal beliefs about McCray's credibility and guilt.* Prosecutors may not state their personal beliefs about the defendant's credibility, but they may characterize a witness as a liar, or a claim that a witness lied, where the evidence reasonably supports that characterization. *State v. Howard*, 1st Dist. Hamilton No. C-130058, 2014-Ohio-655, ¶ 32. In this case, McCray admitted that he had repeatedly lied to the police, and the prosecutor's remarks about his credibility were reasonably drawn from the evidence, so no error occurred. *See State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 117.

{¶54} McCray argues that the prosecutor improperly stated that he thought that he "was going to outsmart the state" when he testified that he had not gone into the bathroom at Hicks's workplace. The prosecutor was referring to the fact that McCray's trial testimony differed from his statement to police, wherein he admitted he had used the bathroom to relieve his bowels. This was fair comment on the discrepancy between his statement to police and his trial testimony. *Id.*

{¶55} McCray contends that the prosecutor implied that he was dishonest and guilty in several instances. In one instance, the prosecutor asked the jury to consider McCray's testimony in light of his jail calls:

> You were so scared[,] that you forgot that [D.W.] was the real murderer in those jail calls. You were so depressed that you decide that there was also all this evidence pointing at you when you weren't the murderer? He had a right to be scared and depressed. Don't get me wrong. He had finally gotten caught for the murder he committed on March 21, 2014, finally after months of hiding.

In another instance, the prosecutor asked jurors to consider why McCray would have given police a false name at the time of his arrest: "Why would an innocent person lie about who he is? What is he hiding from?" In both instances, the prosecutor properly asked the jurors to draw reasonable inferences from the evidence and the testimony, and did not improperly state her personal opinion about McCray's credibility or guilt. *See id.*

{¶56} McCray argues that the prosecutor improperly commented on his choice to go to trial, where the prosecutor said:

> Another prosecutor I've worked with talks a lot about why people go to trial in strong cases against them. We do, and [the other prosecutor] and I agree, we have to prove our case beyond a reasonable doubt. I may ask why - - she asked venue, which means where did we say this crime occurred. In Hamilton County, Ohio. If we forget to ask that, the case could be dismissed because we didn't show that.

> Or somebody could be shot on the 50-yard line at the Super Bowl, and there could still be a trial. Sometimes in the news you see something like, wait a minute, they pled not guilty. Like, how could that be. This is that kind of case.

> If the video happens to be erased, if the defendant's statement is lost, or if we don't get the jail calls, that's up to us to request. So if we don't even ask for those, we don't have them and you don't have them.

23

The prosecutor's remarks were an unfair comment on the defendant's fundamental right to a jury trial. *See State v. Miller*, 1st Dist. Hamilton No. C-010543, 2002-Ohio-3296, ¶ 36. However, after assessing the prosecutors' improper remarks within the context of the entire trial, and more particularly the entire closing argument, we hold that no prejudice resulted in light of the overwhelming evidence of guilt. *See State v. Hart*, 94 Ohio App.3d 665, 674, 641 N.E.2d 755 (1st Dist.1994).

{¶57} *iii. Vouching for state's witnesses.* McCray contends that the prosecutor improperly bolstered Miniko's testimony by implying that he was truthful. The trial court sustained the defense objection to the remark, and McCray has failed to demonstrate that he was prejudiced.

{¶58} McCray argues that the prosecutor improperly vouched for the skill of the police. The prosecutors said of the detectives that they "did an excellent job of interviewing" McCray, and that it was not "until the police do their job and do a great job on this case, and get those photos (of McCray holding the gun)" so that he could not deny that the gun found at his girlfriend's apartment was his. The remarks, however, addressed the thoroughness of the investigation, and not the credibility of the detectives. *See State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 182. And the statements were based upon the evidence produced at trial, "not on outside-the-record evidence or the prosecutor's experience or personal opinion." *Id.* at ¶ 183.

{¶59} *iv. Appeal to the jurors' emotions.* McCray argues that the prosecutor improperly appealed to the emotions of the jurors when she argued:

> The only justice for [J.M.], the only justice for the young man
> who was gunned down and was dying in the streets with his last breath

as he was gasping for air - - he asked his friend, am I going to die - -

the only justice for him is to find this man guilty.

The prosecutor's remark was based upon the evidence presented at trial. D.L. testified that after he and J.M. were shot, J.M. repeated, "I'm gonna die * * * I'm hit, I'm shot." A bystander's efforts to resuscitate J.M. had failed, and the pathologist testified that J.M. had suffered from hypoxia as a result of his wounds. Moreover, a prosecutor's isolated remark calling for justice for a murder victim is not inherently improper and may well fall "within the creative latitude afforded both parties in closing arguments." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 311.

{¶60} *v. Miscarriage of justice.* McCray contends that the prosecutor implied that a not-guilty finding would be a miscarriage of justice. The prosecutor explained the differences between murder, as charged in count 1 of the indictment, and felony murder, as charged in count 2 of the indictment:

Now, the two different murders. Count 2 is there to prevent a

miscarriage of justice in this case if you don't feel that we proved Count

1; and Count 1, as [the other prosecutor] said, we have to show his

purpose or intent was to take [J.M.'s] life. That had to be what his

purpose was when he fired that gun.

And I would submit to you, as [the other prosecutor] said, that

when you point a gun at somebody and you hit them three times and

hit somebody else a number of times, your intent or purpose is to take

their life.

OHIO FIRST DISTRICT COURT OF APPEALS

But in Count 2, all you have to show is that the mental - - and this is in your jury instructions that [the trial judge] will give you - - is that the mental state is called knowingly, not purposely.

This was proper argument because the prosecutor was explaining the difference between the two counts of murder and the different elements involved in each count. When taken in context, the prosecutor did not imply that a not-guilty finding on both counts would be a miscarriage of justice.

{¶61} *vi. Commenting on Other-Acts Evidence.* McCray complains that the prosecutor improperly commented on "other-acts evidence," but a review of the record shows that the prosecutor was commenting on evidence admitted during trial. And McCray did not object to this evidence during the trial. He only objects to it in this appeal as being improperly admitted to establish the disability for the weapons charges.

{¶62} The prosecutor noted that, in interviewing McCray, the police had convinced him that they knew more about McCray's involvement in the shooting than they actually did:

Because [McCray] knows what he did, and he thinks that the police know exactly what he did. And, again, he still minimizes, but he does say that he was the shooter. Just like he minimized his own role in that robbery that he told you about yesterday.

If you remember what he said, he somehow justified it, that he needed birthday money, and that the older kid - - and he called them a little .22, like it wasn't much of a gun; it was just a little .22, implying it really wasn't too bad because it was a small gun.

26

The prosecutor's remarks were reasonably drawn from the evidence and did not urge the jury to find him guilty of the present offenses on the basis that he had acted in conformity with the prior offense. *See* Evid.R. 404(B).

{¶63} *vii. Closing argument conclusion.* After reviewing the prosecutors' closing arguments in their entirety, we hold that, although the prosecutors made some improper remarks, these remarks "did not permeate the state's argument" so as to deny McCray a fair trial. *See Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 203. Consequently, we overrule the third assignment of error.

### *Fourth Assignment of Error: Ineffective Assistance of Counsel*

{¶64} In his fourth assignment of error, McCray argues that he was denied the effective assistance of counsel. To prevail on an ineffective-assistance claim, an appellant must demonstrate that his counsel's performance was deficient, and that, in the absence of counsel's errors there is a reasonable probability that the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Our review of counsel's performance must be "highly deferential." *Strickland* at 689.

{¶65} *A. Failing to request jury instructions.* McCray asserts that his attorneys' performance was deficient because they failed to request jury instructions on the lesser offenses of voluntary manslaughter and aggravated assault, both of which include the mitigating circumstance of serious provocation occasioned by the victim. *See* R.C. 2903.03(A) and 2903.12(A)(1). Generally, the failure to request jury instructions on lesser offenses is a matter of trial strategy and does not establish

ineffective assistance of counsel. *State v. Griffie*, 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996). In this case, a request for instructions on voluntary manslaughter and aggravated assault would have been at odds with McCray's having maintained throughout his testimony that he was not the shooter. Thus, the decision by defense counsel to seek acquittal rather than inviting conviction on a lesser offense was a matter of trial strategy. *See State v. Clayton,* 62 Ohio St.2d 45, 47, 402 N.E.2d 1189 (1980); *State v. Helton*, 1st Dist. Hamilton No. C-850826, 1986 WL 14069, *3 (Dec. 10, 1986). Therefore, we cannot say that counsel's performance was deficient.

{¶66} *B. An "illogical and feckless defense."* McCray contends that defense counsel should not have allowed him to testify that he had been driving the car. He asserts that his admission to driving the car "made him complicit and guilty of the murder and felonious assault." As he concedes, however, the issue of complicity never arose at trial. Nor did the trial court instruct the jury on complicity. Therefore, any claim that the jury would have found him guilty as a complicitor is purely speculative.

{¶67} *C. Failure to object during voir dire.* McCray argues that defense counsel was deficient for not objecting to the state's detailed description of the facts and prospective evidence of the case during voir dire. Appellate courts decline to second-guess the way defense counsel conducts voir dire. *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 63. In this case, we cannot say that counsel's performance in voir dire was deficient. Moreover, McCray has failed to demonstrate that the jury was not impartial. *See id.*

{¶68} *D. Failure to object to closing arguments.* McCray argues that defense counsel was deficient for failing to object to improper comments by the

prosecutors during closing arguments. It is well settled that the failure to make objections, on its own, is not enough to sustain a claim of ineffective assistance of counsel. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 103. Objections "tend to disrupt the flow of a trial" and may be "considered technical and bothersome by the fact-finder." *State v. Campbell*, 69 Ohio St.3d 38, 53, 630 N.E.2d 339 (1994). And an objection "may draw unwanted attention to an issue that might pass without the jury's notice absent the objection." *State v. Ridder*, 1st Dist. Hamilton No. C-150460, 2016-Ohio-5195, ¶ 20. Therefore, as a matter of trial strategy, a reasonable attorney may hesitate to interrupt opposing counsel's arguments. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 42.

{¶69} McCray has failed to demonstrate that, but for counsel's failure to object to the state's closing arguments, the outcome of his trial would have been different. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373. We overrule the fourth assignment of error.

### Fifth Assignment of Error: Weight of the Evidence

{¶70} In his fifth assignment of error, McCray challenges the weight of the evidence upon which his convictions were based. When considering a challenge to the weight of the evidence, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio

St.3d 380, 387, 678 N.E.2d 541 (1997). Because the trier of fact is in a better position to observe the witnesses' demeanor and to assess their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶71} Based upon our review of the record, we cannot conclude that the jury lost its way in finding McCray guilty of the offenses. This is not the "exceptional case in which the evidence weighs heavily against the conviction." *See Thompkins* at 387. Therefore, the convictions were not against the manifest weight of the evidence. We overrule the fifth assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**GORMAN, J.,** concurs.
**ZAYAS, P.J.,** concurs in part and dissents in part.

**ZAYAS**, **P.J.**, concurring in part and dissenting in part.

{¶72} I concur with the majority opinion except with regard to the use of a prior juvenile adjudication as an element of an adult offense. I agree with Judge Cunningham's dissent in *State v. Carnes* that: "If juvenile adjudications are not reliable enough to enhance a criminal sentence, surely they are not sufficiently reliable to alone sustain proof beyond a reasonable doubt of an element of a crime." *Carnes*, 2016-Ohio-8019, ___ N.E.3d ____, ¶ 19 (1st Dist.) (Cunningham, P.J., dissenting). Therefore, I would sustain the first assignment of error on that basis, and would reverse and discharge on the weapon-under-disability counts. I would affirm the trial court's judgment in all other respects.

ROBERT H. GORMAN, retired, from the First Appellate District, sitting by assignment.

**Please note:**

The court has recorded its own entry on the date of the release of this opinion.