[Cite as *State v. Adams*, 2013-Ohio-926.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-120059 |
| | | TRIAL NO. B-1100833 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| PAUL ADAMS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal:  March 15, 2013

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Scott M. Heenan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Wendy R. Calaway*, for Defendant-Appellant.

Please note:  this case has been removed from the accelerated calendar.

**FISCHER, Judge.**

{¶1} Defendant-appellant Paul Adams appeals the judgment of the Hamilton County Court of Common Pleas sentencing him to 21 years in the department of corrections for aggravated burglary and two counts of aggravated robbery with specifications. For the reasons that follow, we affirm the judgment of the trial court.

{¶2} On December 16, 2010, University of Cincinnati ("UC") student and volleyball athlete Natalie Pierce planned to entertain some of her friends for dinner at her apartment on Straight Street near UC's campus. Pierce's friends, Jamie Frey, also a volleyball player, and two UC football players, Dominick Goodman and Quentin Hines, were all at Pierce's apartment that day. At some point in the afternoon, Hines left Pierce's apartment, planning to return around 6:00 p.m. for dinner.

{¶3} A few minutes before 6:00 p.m., Pierce heard a knock at her apartment door. She looked through the peephole of the door, but she could not see who was standing outside. When she asked who was there, a man replied, "Q." She opened the door, believing the person to be Hines returning for dinner. Instead, a large African-American male in his early 20s with dreadlocks and wearing a knit cap shoved the door open and put a gun in her face. He demanded that Pierce lie on the floor. The intruder then ordered Goodman to the floor as well, putting the gun in Goodman's face. Goodman began moving around, and the intruder threatened, "Do you want me to pull this?" Goodman also tried to conceal his cell phone, but the intruder saw him and demanded that he give him the phone. The intruder then demanded "more items" from Pierce, so Pierce told him that her iPod was on the

2

kitchen countertop.  The intruder left, telling Pierce and Goodman not to get up until they heard the door close.

{¶4}  In all, the intruder stole Pierce's laptop, iPod, purse, Big East Championship ring, and her cell phone.  The intruder also stole Goodman's camcorder, cell phone, and cash.  Frey, who had been in the bathroom during the robbery, also had her wallet and cell phone stolen.  Frey had seen the armed intruder through the bathroom door, but had shut it and had hidden in a closet attached to the bathroom to avoid being seen.

{¶5}  Pierce suspected that an acquaintance, former UC football player Demetrius Jones, may have had a role in the crime.  Jones had transferred to another university, but Jones had been texting Pierce the day of the robbery and had told Pierce that he was in town and wanted to "hang out."  Just before the robbery, Jones had asked Pierce who was at her place.  She had responded that Frey and Goodman were there, and she had told him that "Q" or Hines would be coming over for dinner.  Given her suspicions, Pierce logged into her Facebook account so that she could look through Jones's Facebook "friends."  She came across a picture of Adams, the defendant.  Pierce gave the picture to Cincinnati Police Detective Kip Dunagan because she was 100 percent sure that Adams had been the armed robber.

{¶6}  Meanwhile, Detective Dunagan began his own investigation.  Dunagan learned that the robber had used Pierce's U.S. Bank debit card to make a purchase at Amazon.com.  The customer email address used for transaction was padams17@yahoo.com, and the shipment address listed an address in Chicago, Illinois.  With the assistance of UC telecommunications employees, Dunagan was able to pinpoint that the Amazon.com transaction was made with UC basketball

player Anthony McClain's wireless Internet identification in the area of the University Park Apartments. Dunagan learned that Jones and Adams had been staying with McClain and his roommate, fellow basketball player Dion Dixon, at the University Park apartments during the day of the robbery.

{¶7} The grand jury returned an indictment charging Adams with aggravated burglary under R.C. 2911.11(A)(2) accompanied by firearm specifications, two counts of aggravated robbery under R.C. 2911.01(A)(1), one for Pierce and one for Goodman, also accompanied by specifications, and two counts of robbery under R.C. 2911.02(A)(2), one for Pierce and one for Goodman. The matter proceeded to a jury trial.

{¶8} At trial, the state presented the testimony of Pierce, Goodman, and Frey, who testified as to what had happened during the robbery, and Pierce's discovery of Adams on Facebook. The state also presented Detective Dunagan's testimony about the investigation that had led him to Adams and an interview that he had had with Adams. In the interview, Adams had admitted to using padams17@yahoo.com as his email address, but had insisted that he had been in Chicago, his hometown, on the day of the robbery.

{¶9} The state also presented the testimony of Henry McDavis. McDavis testified that he had lived in the same apartment building as Pierce. The day of the robbery, he had seen two African-American men getting out of a white car. He had seen them trying to get through the front door of his building, which had required them to "buzz" individual residents, who would then unlock the door. McDavis had accessed the building through another door at the rear of the building, and then he had seen both men inside the building. One of the men asked McDavis if he had seen

4

"Dominick." After the robbery, McDavis had identified Demetrius Jones in a photo lineup as one of the two men he had seen, although he admitted at trial that he had only been "40 percent sure" it was Jones.

{¶10} Hines also testified for the prosecution. Hines stated that he had left Pierce's house with the intent of returning, but had not because he had spent time with his girlfriend instead. Hines testified that he had also spoken with Jones shortly after he had left Pierce's apartment, and that he had told Jones that Goodman and Frey had been at Pierce's when he had left. Jones had told Hines that he was back in town. Hines acknowledged that he had not called Pierce to let her know that he would not be returning.

{¶11} The state also presented the testimony of a Verizon wireless employee, who substantiated the ingoing and outgoing communications from Pierce's phone to a phone that had been linked to Jones's phone through earlier testimony from Pierce.

{¶12} Dixon testified that he had been living with McClain in December 2010, and that on December 16, Jones had visited their apartment with a friend. Dixon identified Adams in court as the friend that had been with Jones. Dixon testified that he and McClain had had basketball commitments that had required them to be away from home from 2:00-2:30 p.m. until 7:00 p.m. that day. Jones and Adams had been at the apartment when they had left and when they had returned. UC basketball assistant Andrew Seidenberger's testimony substantiated that Dixon and McClain had been at practice and then a team meal that had started at 5:30 p.m. Although Seidenberger acknowledged that Dixon and McClain could have signed the sign-in sheet for the meal and then left.

{¶13} After the conclusion of the state's case, Adams testified in his own defense. Adams testified that he had been staying with Dixon and McClain on the day of the robbery. Adams acknowledged that he had lied to Detective Dunagan about being in Chicago at the time, stating that he had been frightened. Adams testified that he had stayed at Dixon's and McClain's apartment all afternoon, talking on the phone, while Jones had left for a short time. According to Adams, when Jones had returned, he had used McClain's laptop in another room. Adams admitted that he had had an email address of padams17@yahoo.com, but Adams insisted that Jones would have had access to his email address and password—although Adams admitted that he had told Detective Dunagan that two people had had his email and password combination, neither of which was Jones.

{¶14} The jury found Adams guilty of all counts and accompanying specifications. The trial court sentenced Adams to five years in prison on the aggravated-burglary charge, five years in prison on each of the aggravated-robbery charges, and three years in prison on two of the underlying specifications, for a total of 21 years in the department of corrections. This appeal ensued.

### Sufficiency and Manifest Weight of the Evidence

{¶15} Adams's first assignment of error asserts that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. When reviewing a challenge to the sufficiency of the evidence, we must determine, after viewing the evidence in a light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the offenses proved beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. By contrast, when reviewing a

challenge to the manifest weight of the evidence, we must determine whether the jury clearly lost its way and created a manifest miscarriage of justice such that we must reverse the convictions and order a new trial. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶16} Adams does not argue that the facts as presented by the state fail to establish that the crimes of aggravated burglary and aggravated robbery occurred. Instead, Adams contends that he was not the perpetrator. Adams argues that no physical evidence tied him to the crimes, and that the state's case against him was circumstantial. He also attacks the identifications made by the victims, arguing that the victims did not have the opportunity to make a reliable identification given the circumstances of the stressful, chaotic situation.

{¶17} Pierce testified that when she had seen Adams's picture on Facebook, she had been certain that Adams had been the intruder. Goodman also testified that Adams had been the perpetrator. When Adams had been questioned by Detective Dunagan as to his involvement, he had lied, stating that he had been in Chicago at the time, but then admitting at trial that he had been staying at McClain's near UC's campus the day of the robbery. Pierce's stolen debit card had been used to purchase online items using McClain's Internet identification, and Adams's email address. The shipment address was an address in Chicago, Illinois, Adams's hometown. Adams testified at trial that Jones would have had access to his email address and password combination, but this contradicted Adams's statement to Detective Dunagan that two people had had his combination, neither of which had been Jones. The evidence presented by the state was sufficient to prove that Adams had committed the offenses of which he was convicted. Nor can we determine that the

jury clearly lost its way and created a manifest miscarriage of justice in finding Adams guilty.

{¶18} Adams's first assignment of error is overruled.

### *Allied Offenses of Similar Import*

{¶19} In his second assignment of error, Adams argues that the trial court erred in sentencing Adams separately on two counts of aggravated robbery and one count of aggravated burglary because those offenses were allied offenses of similar import under R.C. 2941.25.

{¶20} Under R.C. 2941.25, Ohio's multiple-count statute, a trial court, in a single proceeding, may convict a defendant for two or more offenses having as their genesis the same criminal conduct or transaction, if the offenses (1) were not allied offenses of similar import, (2) were committed separately, or (3) were committed with a separate animus as to each offense. *State v. Anderson*, 1st Dist. No. C-110029, 2012-Ohio-3347, 974 N.E.2d 1236, ¶ 15, citing *State v. Bickerstaff*, 10 Ohio St.3d 62, 65-66, 461 N.E.2d 892 (1984), and *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 51. Unless committed separately or with a separate animus, allied offenses must be merged for purposes of sentencing following the state's election of which offense should survive. *Anderson* at ¶ 15, citing *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, paragraph two of the syllabus.

{¶21} This court reviews allied-offense issues by examining the evidence adduced before the trial court, and if the evidence shows that the state relied upon the same conduct to prove the offenses, and that the offenses were committed neither separately nor with a separate animus as to each, then the defendant is

afforded the protections of R.C. 2941.25, and the trial court errs by imposing separate sentences for the offenses. *Anderson* at ¶ 20; *Johnson* at ¶ 56.

{¶22} Adams argues that the two aggravated-robbery counts—one for each victim—were part of one course of conduct, and that he should have only been sentenced on one count of aggravated robbery. We disagree because we determine that Adams committed the robberies with a separate animus as to each. In determining whether a separate animus exists as to each offense, this court has explained that animus means "immediate motive," and where " 'an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, *a priori*, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime.' " *State v. Shields*, 1st Dist. No. C-100362, 2011-Ohio-1912, ¶ 16, quoting *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979); *see also Anderson* at ¶ 34 (explaining that "ordinarily * * * when there is more than one victim of the same crime" an offender may be sentenced for more than one crime).

{¶23} In this case, the evidence adduced at trial demonstrated that Adams had committed the robbery offense against Pierce and the robbery offense against Goodman with separate immediate motives. After bursting through the door to Pierce's apartment wielding a gun, Adams had forced Pierce to lie face-down on the ground. Adams then had insisted the same of Goodman after placing a gun in Goodman's face. Adams had demanded that Goodman give Adams his cell phone, which Goodman had tried to conceal, unsuccessfully, from Adams. Adams then had demanded "more items" from Pierce, and Pierce had told him that her iPod was on the kitchen countertop. Adams then had fled with Pierce's laptop computer, iPod,

purse, cell phone, and Big East Championship ring, as well as Goodman's cell phone, camcorder, and cash. This evidence supports Adams's convictions for two counts of aggravated robbery—one for Pierce and one for Goodman.

{¶24} Adams further argues that he should have been sentenced on either aggravated burglary or aggravated robbery, but not both, pursuant to the multiple-count statute. Adams asserts that the aggravated burglary "could not have been committed in this case without the aggravated robbery." Adams's argument is not well-taken.

{¶25} Adams was convicted of aggravated burglary under R.C. 2911.11(A)(2), which provides that "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure * * * with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if * * * [t]he offender has a deadly weapon * * * ." He was also convicted of two counts of aggravated robbery under R.C. 2911.01(A)(1), which provides that "[n]o person, in attempting or committing a theft offense, * * * or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person * * * and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"

{¶26} The following evidence adduced at trial supported Adams's aggravated-burglary offense: While armed with a gun, Adams had knocked on Pierce's apartment door and had stood out of the doorway to avoid being seen through the peephole. When Pierce had asked who was there, Adams had replied, "Q," presumably knowing through Jones that Pierce had been expecting her friend

10

Quentin Hines to arrive for dinner. Once Pierce had unlocked the door, Adams had forcefully pushed open the door. Through this conduct alone, the state presented sufficient evidence from which the jury could have concluded beyond a reasonable doubt that Adams had trespassed by force or deception into Pierce's apartment while possessing a gun with the purpose of committing a criminal offense once inside.

{¶27} By contrast, Adams's conduct once inside the apartment supports the aggravated-robbery convictions: Adams had forced both of the victims to the ground while brandishing a gun. Adams had demanded items from both victims separately, and had stolen multiple items from both victims. Because the state relied upon different conduct in proving the aggravated-robbery offenses, as compared to the aggravated-burglary offense, those offenses are not allied offenses of similar import in this case.

{¶28} Therefore, the trial court did not err in sentencing Adams separately for two counts of aggravated robbery and one count of aggravated burglary. We overrule Adams's second assignment of error.

### Specifications for Same Act or Transaction

{¶29} In his third assignment of error, Adams argues that the trial court erred in convicting him of multiple firearm specifications when those convictions arose out of the same act or transaction.

{¶30} R.C. 2929.14(B)(1)(a)(ii) requires a trial court to impose a three-year prison term on an offender who is convicted of a firearm specification under R.C. 2941.145. R.C. 2929.14(B)(1)(b) provides that **"[e]xcept as provided in division (B)(1)(g) of this section**, a court shall not impose more than one prison term on

an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction." (Emphasis added.) R.C. 2929.14(B)(1)(g) provides,

> [i]f an offender is convicted of * * * two or more felonies, if one or more of those felonies [is] * * * aggravated robbery * * *, and if the offender is convicted of * * * a specification [under R.C. 2941.145] in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted * * * and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶31} Because Adams was convicted of two aggravated robberies, each accompanied by a firearm specification under R.C. 2941.145, the trial court was required to impose at least two prison terms for those firearm specifications under R.C. 2929.14(B)(1)(g). Therefore, the trial court's sentence with respect to the firearm specifications was authorized by law, and we overrule Adams's third assignment of error.

### Specifications and Double Jeopardy

{¶32} In his fourth assignment of error, Adams argues that R.C. 2941.25 is unconstitutional as applied to his aggravated-robbery convictions, which were each accompanied by a firearm specification. Adams argues that his convictions under R.C. 2911.01(A)(1) for aggravated robbery required proof beyond a reasonable doubt

12

that Adams had had a deadly weapon and had displayed, brandished, indicated possession of, or used the deadly weapon.  Similarly, firearm specifications under R.C. 2941.145 require proof that an offender had a firearm and displayed, brandished, indicated possession of, or used the firearm.  Adams contends that the firearm specifications amount to an additional punishment in violation of the Double Jeopardy Clause.

{¶33}  The Double Jeopardy Clause " 'protects against multiple punishments for the same offense.' " *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535, 542 (1983), quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).  The United States Supreme Court has stated that "with respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Hunter* at 366.

{¶34}  The Ohio Supreme Court has held that firearm specifications are not "offenses" as that term is used in R.C. 2941.25, but "penalty enhancements," and therefore, specifications do not invoke Ohio's multiple-count statute. *State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, 945 N.E.2d 498, paragraph one of the syllabus. Thus, per the reasoning of *Ford*, the Ohio legislature intended that an offender receive additional prison time for specifications as provided in R.C. 2929.14(B). Consequently, Adams's double-jeopardy argument is without merit.  We overrule Adams's fourth assignment of error.

### Conclusion

{¶35} Because we overrule Adams's assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**HENDON, P.J.,** and **DINKELACKER, J.**, concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.