[Cite as *State v. Smith*, 2020-Ohio-4976.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-190507 |
|  |  | TRIAL NO. B-1704493 |
| Plaintiff-Appellee, | : |  |
|  |  |  |
| vs. | : | *O P I N I O N.* |
|  |  |  |
| TIFFANY SMITH, | : |  |
|  |  |  |
| Defendant-Appellant. | : |  |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: October 21, 2020

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna*, for Defendant-Appellant.

**MYERS, Judge.**

{¶1}  Tiffany Smith was convicted of felonious assault for pistol-whipping Lacy King, and murder for fatally shooting King minutes later, during a brawl that involved Smith's 16-year-old daughter and King's 15-year-old niece.  In this appeal, Smith challenges the weight and sufficiency of the evidence supporting her convictions, asserting that she acted in self-defense and in defense of her daughter. She also argues that the court committed evidentiary and sentencing errors, that she was deprived of the effective assistance of counsel, and that she was prejudiced by prosecutorial misconduct.  We affirm the trial court's judgment.

*The Evidence at Trial*

{¶2}  At trial, the state presented evidence through testimony and a videotape of the incident.  According to the evidence, Smith's daughter T.J. was standing in Joe's Drive-Thru in Lockland with a friend when a car driven by King pulled in.  King's sister Yohna Bryant was in the front passenger seat and Bryant's daughter C.M. (King's niece) was in the rear seat behind Bryant.

{¶3}  According to Bryant, T.J. had been bullying C.M. for years.  A month earlier, T.J. and a friend had jumped C.M., and shortly after that, Bryant had informed T.J. and her older sister Shila[1] that Bryant had "put warrants out" on T.J.

{¶4}  Bryant testified that T.J. approached King's car in the drive-thru, speaking angrily, so she and King began to argue with T.J.  When T.J. threatened to kick King's car, King told her not to touch the car, and King and Bryant jumped out of the car to back T.J. away from it.

{¶5}  Bryant testified that T.J. called Smith during this argument. According to Bryant, she knew T.J. was on the phone with her mom "[b]ecause she was on the phone saying * * * [C.M.'s] mother and aunt are up here messing with

---

[1] Shila's name is spelled various ways throughout the trial transcript.

me." Bryant testified that when she heard T.J. on her phone, she yelled at T.J., "Well, go get your retarded mama." Bryant acknowledged that she later told police that King was "[c]ussing [T.J.] out like, 'Little girl, go get your mama * * * And you're not going to kick my car * * * I'll beat you up.' " After a drive-thru employee intervened, King and Bryant got back into the car, and King talked to another employee about purchasing items.

{¶6} Then, T.J.'s brother Tamiko[2] came into the drive-thru, followed shortly thereafter by Smith. According to Bryant, Smith walked into the drive-thru, approached her on the passenger side of King's car, and said, "Bitch, I'm going to kill you." Just then, T.J. reached into the rear passenger window of the car, punched C.M., and grabbed C.M.'s hair. Then C.M. jumped out of the car and started fighting T.J. Bryant and King jumped out to help C.M.

{¶7} Bryant testified that Smith began to strike King with a gun so Bryant grabbed the gun to take it away from Smith. According to Bryant, Tamiko grabbed her by the arms so that she could not do anything, and Smith "put the gun to my face at that point."

{¶8} Bryant testified that as she was being held by Tamiko, Smith was grabbing King's hair and beating her with the gun. She estimated that Smith hit King with the gun ten or 12 times. Bryant said that King was trying to get away from Smith and that King's shirt was torn off in the fight.

{¶9} Bryant said that Smith pointed the gun at her again as King walked back to the car to clean blood off of herself and to fix herself up. According to Bryant, when Tamiko let go of her, Smith was still pointing the gun at her: "[Smith] didn't say absolutely nothing. She just looked at me crazy and pointed the gun at me."

---

[2] Smith's son's name is spelled various ways throughout the trial transcript.

Bryant said that as she and King were about to get back in the car to leave, Smith put the gun into her bra.

{¶10} Bryant testified that as she was getting into the car, she saw that C.M. was fighting T.J. and her friend in a corner of the drive-thru, so she and King headed to that corner to break up the fight. Bryant testified that she noticed that Smith had pulled the gun back out of her bra and "had it out." Bryant said that she broke up the fight, grabbed her daughter C.M., and started back to the car. According to Bryant, King saw that Bryant and C.M. were on their way back to the car, so King started towards the car as well. Bryant testified:

> All I know is when I turned around and seen my sister going towards
> the car, I heard and seen [Smith] pull the trigger and heard the shot.
> And my sister just grabbed her arm and said, "The bitch shot me,
> Yohna. Take me to the hospital."

{¶11} Bryant testified that until she saw a surveillance video of the incident, she did not know that as she and King went to break up the fight between C.M. and the other girls, King had grabbed a plastic bottle from a refrigerator and had struck Smith with it. Bryant testified, "I didn't even see that, I guess she went to attack [Smith] because she had her gun out."

{¶12} Bryant testified that as she frantically drove to the hospital, King lost consciousness. Bryant realized that she could not make it to the hospital, so she pulled up to the Reading police station. Police and firefighters immediately responded to attend to King, but she died as a result of her gunshot wound.

{¶13} Lockland Police Sergeant Christopher Lind testified that he received a frantic call from Joe's Drive-Thru in Lockland about someone having a gun. As he and two other officers walked out of their station to respond to the drive-thru, they encountered a hysterical T.J. at their door, who told them, "My mom just shot somebody."

4

**{¶14}** As Smith got out of her car and walked toward the officers, she appeared to be irate. When the officers asked her if she shot somebody, Smith yelled, "Yeah, I did it, I shot someone." After Smith was taken into custody, police recovered her gun from her car and Smith handed them her gun holster, which had been under her shirt.

**{¶15}** Sergeant Lind testified that the drive-thru surveillance video showed that King grabbed a plastic 12-ounce soft drink bottle from a refrigerator and struck Smith with it and that Smith fired her gun, striking King. He testified that the police did not recover the bottle because the drive-thru employees had already begun to clean up the scene.

**{¶16}** Hamilton County Sheriff's Detective Kevin Illing testified that when he interviewed Smith, she told him that "she did not want to be hit with that bottle."

**{¶17}** Smith testified that T.J. called her to pick her up from the drive-thru because "[C.M.'s] mother and them keeps pulling down on me." Smith said she had been sitting in bed with a gun in a holster clipped to the front of her bra because she did not want the four-year-old child in her home to access it. Smith told T.J., "I'm on my way," and asked her adult son Tamiko to go with her.

**{¶18}** Smith said that she parked and intended to stay in the car, but when her son and T.J. did not immediately come outside, Smith went into the drive-thru to see what was going on. Smith testified that when she walked into the drive-thru, she asked T.J., "Which one is the mother?," and T.J. replied, "She's on the passenger side." Smith said that she walked along the passenger side of King's car, and that she was holding onto her gun, which was in the holster on her bra, because it was unstable in her loose-fitting bra.

**{¶19}** Smith testified that her purpose in walking up to the passenger side was to address C.M.'s mother (Bryant) to get to the bottom of the problem between their daughters so there "wouldn't be an ongoing feud." Smith also testified that she

5

had no idea that there had been a prior incident involving T.J. and C.M., or that "there was a problem with the two girls at all." Smith said that her daughter Shila had never told her about Bryant's having put warrants out on T.J.

{¶20} According to Smith, as Bryant got out of the car, Bryant told her that T.J. had hit her daughter. Smith testified, "I had already pulled my weapon when [Bryant] first started to get out of the car[.]"

{¶21} Smith testified that C.M. jumped out of the car and on top of T.J., and that King jumped out of the driver's side and knocked T.J. to the ground. She said that King had T.J.'s hair in her hands as she banged T.J.'s head against the concrete floor. Smith said that her "only instinct was to get the adult off my daughter." Smith testified, "I'm pulling [King] with everything in me, I'm exhausted. * * * I tore two shirts and a bra off her and she still didn't stop." Smith testified that she thought T.J. was going to be killed or suffer brain damage. Smith said that she began hitting King with the gun to get King off of T.J. because, after pulling King's clothing off, she had nothing else to grab onto to get King off of T.J.

{¶22} Smith testified that she stopped hitting King for a moment because she was exhausted, but then she resumed hitting her. The altercation between King and T.J. ended when King broke away and walked over to her car. Smith testified that she was afraid that King might be getting a weapon.

{¶23} Smith testified that her son had been holding onto Bryant to keep her from attacking so she told him to let Bryant go, and she pointed the gun at Bryant and told her, "[Y]ou stop, don't do it," because she did not want Bryant to attack her. Smith testified that her warning worked because Bryant went back to the car as soon as her son let Bryant go. Both King and Bryant went to get in the car, and Smith put the gun back into her bra.

{¶24} Smith said that she turned to leave the drive-thru: "I headed on my way out of there." She explained, "To me[,] it was over. I was back pedaling trying to

get out of there." Smith said she stopped at the end of the drive and glanced back and noticed that T.J. was not behind her anymore. Smith turned and saw the fight going on between T.J., T.J.'s friend, and C.M.

{¶25} Smith testified that King then ran to the refrigerator to grab something and charged at her. Smith had been to that drive-thru hundreds of times and knew that the refrigerators there contained drinks in glass bottles, plastic bottles, and aluminum cans. Smith said that King "reached up above her head and she came down and hit me twice in the face." Smith said that she was in fear for her life "[b]ecause I didn't want her to hit me with the bottle and knock me unconscious." Smith testified that she believed that King had a glass bottle that could seriously hurt her. Smith said that she never saw the bottle that King used.

{¶26} Smith testified that after she fired the shot, "I believe I probably was in shock. I just turned and wanted to get out of there." Smith said that she got into her car and called 911 as she drove directly to the Lockland police station. Smith testified that she had a permit to carry a concealed weapon.

{¶27} The drive-thru surveillance video, which contained no audio, depicted the following sequence of events: T.J. and her friend were standing by the refrigerators when King drove into the drive-thru and stopped the car. King and her passengers then looked toward the back of the car as T.J. and her friend walked behind the car to cross the drive-thru.

{¶28} An employee approached King's open window while T.J. and her friend stood near the back of the drive-thru. King can be seen unbuckling her seat belt and opening her door. She then closed her door and she and T.J. appeared to be speaking back and forth. At one point, Bryant opened her door and got out of the car, while King appeared to continue speaking to T.J. Bryant then stood by the passenger door and appeared to speak to T.J., who stood by the rear corner of the driver's side of the car.

{¶29} T.J. then walked behind the car and stood facing the car, gesturing with her arms, as her friend stood between T.J. and the car. As T.J. walked toward the driver's side of the car, her friend placed an arm across T.J.'s chest.

{¶30} King opened her door, and she and Bryant walked toward T.J., as T.J.'s friend kept T.J. behind her and backed away. Bryant appeared to be yelling.

{¶31} An employee stepped near the girls, and the women walked back to the car and got in. The verbal altercation appeared to continue, and at one point, T.J. appeared to be holding a phone to her ear. As the confrontation continued, T.J. and Bryant appeared to speak angrily to each other as employees stood between them.

{¶32} King appeared to kick off a sandal and take off a bracelet. At this point, Bryant got back into the car, and an employee began to move King toward her driver's door. King and T.J. were still speaking to each other as King got into the car.

{¶33} Then T.J. walked out of the drive-thru while she continued to gesture. Bryant and King were in their car with the doors closed when T.J. walked back into the drive-thru.

{¶34} Then Tamiko entered the drive-thru. T.J. then walked quickly toward the rear passenger side of King's car, and Smith entered the drive-thru moments later.

{¶35} As T.J. walked to the rear passenger window, Bryant's door began to open, but it was quickly closed by an employee. Smith then approached the passenger side of the car, as T.J. moved behind the car. T.J. reached into the rear passenger window and appeared to strike C.M.

{¶36} Then Bryant and King got out of the car, and C.M. started to climb out of the rear passenger window, while T.J.'s friend pulled T.J. back a few feet from the car.

{¶37} As Bryant stood near her door, King ran around the back of the car and appeared to strike T.J. T.J's friend then appeared to strike King, and Smith appeared

8

to strike someone. At this point, the fight continued with Bryant grabbing Smith's right arm, which appeared to be swinging at someone. Then Tamiko grabbed Bryant from behind and held her.

{¶38} C.M. and T.J's friend were pulling each other, fighting, toward the rear of the drive-thru. At the same time, Smith pulled King by the shirt, which came partially off as King continued to fight T.J. Smith then struck King with the gun.

{¶39} Smith stepped back for a moment as King and T.J. continued to fight. Then Smith continued to strike King with the gun. King was holding T.J. by the hair during this time. An employee tried to get between King and T.J., as another employee moved Smith back.

{¶40} King then went back to her car, as Tamiko continued to hold onto Bryant near the back of the car. Smith then pointed the gun at Bryant, as T.J. walked to the rear of the drive-thru toward the fight that was still going on between C.M. and T.J.'s friend.

{¶41} Smith put her gun back in her shirt as Bryant walked toward the car. As Bryant opened her car door, she appeared to see C.M. fighting in the rear of the drive-thru.

{¶42} Bryant, Smith, and King all walked toward the rear of the drive-thru toward the girls' fight. King opened a refrigerator and then approached Smith. As she did, she struck Smith with an object twice. King then bent forward and stumbled away from Smith toward the car, as Smith stepped backward out of the drive-thru.

*The Verdicts and Sentence*

{¶43} At the conclusion of the trial, the jury returned guilty verdicts finding Smith guilty of two counts of murder, in violation of R.C. 2903.02(A) and 2903.02(B), two counts of felonious assault, in violation of R.C. 2903.11(A)(1) and 2903.11(A)(2), with accompanying one-year and three-year firearm specifications for each offense.

{¶44} The trial court merged the murder counts and sentenced Smith to 15 years to life in prison for murder in violation of R.C. 2903.02(A). The court merged the felonious-assault counts and sentenced Smith to three years in prison for felonious assault in violation of R.C. 2903.11(A)(1). The court ordered the prison terms for murder and felonious assault to be served concurrently. The court merged the one-year and three-year firearm specifications for each underlying offense and imposed sentence on both of the three-year firearm specifications. The court ordered these three-year firearm specifications to be served consecutively to the underlying offenses and to each other, for an aggregate prison term of 21 years to life. Smith now appeals.

*Weight and Sufficiency*

{¶45} In her first, second, and third assignments of error, Smith argues that her convictions were not supported by the weight and sufficiency of the evidence because she acted in self-defense and in defense of another. While Smith does not deny that she shot and pistol-whipped King, she contends that she acted in self-defense and in defense of her daughter T.J. Smith argues the three assignments of error together.

{¶46} In a challenge to the sufficiency of the evidence, the question is whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *State v. McFarland*, Slip Opinion No. 2020-Ohio-3343, ¶ 24, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.*

10

*Self-Defense and Defense of Another*

**{¶47}** Smith argues that the state failed to prove beyond a reasonable doubt that she did not act in self-defense when she shot King and that she did not act in defense of another (T.J.) when she struck King with the gun.

**{¶48}** The elements of self-defense in the use of deadly force are: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape from such a danger was in the use of such force, and (3) the defendant did not violate any duty to retreat or avoid the danger. *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). The elements of self-defense are cumulative, so a defendant's self-defense claim fails if any one of the elements is not present. *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 73; *State v. Edwards*, 1st Dist. Hamilton No. C-110773, 2013-Ohio-239, ¶ 9.

**{¶49}** Under R.C. 2901.05, if there is evidence presented at trial that tends to support that the defendant used force against another in self-defense or in defense of another, the state must prove beyond a reasonable doubt that the defendant did not use the force in self-defense or defense of another. R.C. 2901.05(B)(1). Once the initial showing is made, the burden of persuasion requires the state to disprove at least one of the elements of self-defense (or defense of another) beyond a reasonable doubt. *State v. Petway*, 2020-Ohio-3848, ____ N.E.3d ____, ¶ 55 (3d Dist.); *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31.

**{¶50}** In this case, the state does not contest that there was evidence tending to show that Smith acted in self-defense or in defense of another. Therefore, the state was required to disprove self-defense involving deadly force by proving beyond a reasonable doubt that the defendant (1) was at fault in creating the situation giving rise to the affray; or (2) did not have a bona fide belief that she was in imminent

11

danger of death or great bodily harm for which the use of deadly force was her only means of escape, or (3) violated a duty to retreat or avoid the danger. *Carney* at ¶ 31.

{¶51} The state need only disprove one of the elements of self-defense beyond a reasonable doubt. *State v. Williams*, 9th Dist. Summit No. 29444, 2020-Ohio-3269, ¶ 10. Therefore, in reviewing a sufficiency-of-the-evidence challenge involving self-defense, we must view the evidence in a light most favorable to the state, and determine whether any rational trier of fact could have found that the state disproved at least one of the elements of self-defense beyond a reasonable doubt. *State v. Davis*, 10th Dist. Franklin No. 19AP-521, 2020-Ohio-4202, ¶ 27.

### Self-Defense: Murder

{¶52} With respect to the murder offense, Smith argues that the state failed to disprove any of the elements of self-defense beyond a reasonable doubt.

### a. Fault in Creating the Situation

{¶53} Ohio courts have recognized that a person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense. *Petway*, 2020-Ohio-3848, ____ N.E.3d ____, at ¶ 76 (defendant angrily confronted the victim), citing *State v. Nichols*, 4th Dist. Scioto No. 01CA2775, 2002-Ohio-415 (defendant followed the victim to provoke an altercation); *State v. Sekic*, 8th Dist. Cuyahoga No. 95633, 2011-Ohio-3978, ¶ 15 (defendant "willingly advanced toward a volatile situation").

{¶54} Smith asserts that she was not at fault in creating the situation that led to the murder because King attacked her with the bottle. The question before us is whether, when viewing the evidence in the light most favorable to the state, the jury could reasonably have found that Smith was at fault for creating the situation leading to the murder. We find that it could.

{¶55} For example, the jury could have concluded that Smith entered the drive-thru with a gun, escalating a situation that had already been defused. Then,

after Smith pistol-whipped King, and King retreated to her car, the jury could have found that Smith's pointing her gun at Bryant and threatening her showed Smith was at fault in creating the situation leading to the throwing of the bottle. And a jury could have found that Smith pulled the gun back out before she was struck with the bottle, thus being at fault in creating the situation.

### b. Bona Fide Belief of Imminent Danger

{¶56} The second element of self-defense involves both objective and subjective tests. *State v. Vanover*, 1st Dist. Hamilton No. C-990104, 2000 WL 1434161, *3 (Sept. 29, 2000), quoting *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997). A defendant's belief that she was in immediate danger of death or great bodily harm must be objectively reasonable, and the defendant must have an honest belief that she was in such danger. *Williams*, 9th Dist. Summit No. 29444, 2020-Ohio-3269, at ¶ 29, citing *Thomas* at 331. If the objective standard is met, "the jury must determine if, subjectively, this particular defendant had an *honest* belief that she was in immediate danger." *Thomas* at 331. The state may disprove self-defense by demonstrating that Smith's belief was not objectively reasonable or that she did not have an honest subjective belief that she faced imminent death or great bodily harm. *See Williams* at ¶ 29.

{¶57} Smith argues on appeal that she had reasonable grounds to believe that she was in imminent danger of death "[b]ased on the fact that King would not stop beating [Smith's] daughter even after [King's] shirt and bra were torn off, * * * and then went back to the car and cooler to grab an object to strike Ms. Smith and fight her, and did so[.]" However, on cross-examination, Smith admitted that when King approached her, she pulled the gun back out. Although Smith said she did not know she had been struck with a plastic bottle, Detective Illing testified that he observed no injuries of any sort on Smith, and Smith admitted that she did not have a scar on her head from being hit with the bottle. When shown the video of the

13

incident, Smith admitted that after King dropped the bottle, it fell to the ground without breaking, and that T.J. had grabbed the same bottle and thrown it, and that the bottle had again struck the ground without breaking. Viewing the evidence in the light most favorable to the prosecution, we find that the jury could reasonably conclude that once Smith was hit with the plastic bottle, she knew it was plastic, and she knew that a plastic bottle was not capable of inflicting death or great bodily harm, so her belief was not objectively reasonable. Even if Smith's belief that she was in danger of death or great bodily harm was objectively reasonable, the jury could have rejected her testimony and concluded that Smith knew she had been struck with a plastic bottle.

### c. Duty to Retreat

{¶58} With respect to the duty to retreat, "in most cases, 'a person may not kill in self-defense if he has available a reasonable means of retreat from the confrontation.' " *State v. Morgan*, 1st Dist. Hamilton No. C-160495, 2017-Ohio-7489, ¶ 36, quoting *Thomas*, 77 Ohio St.3d at 326, 673 N.E.2d 1339. The question before us is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that Smith violated a duty to retreat. We find that it could.

{¶59} For example, Bryant testified that there had been nothing to block Smith and T.J. from leaving the drive-thru. According to Bryant, Smith did not try to get T.J. to leave or to stop fighting. Instead, Smith "encouraged the situation. * * * She just came brandishing her gun just ready to fight[.]"

{¶60} And Smith acknowledged that when she first entered the drive-thru, Bryant and King were in their car trying to make a purchase yet she approached the car with her hand on her gun. Smith admitted that she could have grabbed T.J., who was standing behind the car, and taken her out of the drive-thru as soon as she arrived. However, she admitted, "at that point, I was not trying to get her out."

{¶61} Smith also acknowledged that after she pistol-whipped King, King and Bryant were going back to the car, and T.J. was away from them, so Smith could have left. Considering all this testimony, the jury reasonably could have found that Smith violated her duty to retreat at any one of these points.

*Self-Defense Conclusion*

{¶62} Therefore, with respect to Smith's self-defense argument as to the murder offense, the jury could have reasonably found that Smith was at fault in creating the situation that led to the affray, that she did not have a bona fide belief of imminent danger of death or great bodily harm, or that she violated a duty to retreat. Viewing the evidence in a light most favorable to the prosecution, we hold that the jury could reasonably have found that the state disproved at least one of the elements of self-defense with respect to the murder charge beyond a reasonable doubt.

*Defense of Another: Felonious Assault*

{¶63} With respect to the felonious-assault offense, Smith asserts that the state failed to prove beyond a reasonable doubt that she did not act in defense of T.J. when she pistol-whipped King.

{¶64} Defense of another is a variation of self-defense. *State v. Moss*, 10th Dist. Franklin No. 05AP-610, 2006-Ohio-1647, ¶ 13. "If a person in good faith and upon reasonable grounds believes that a family member is in imminent danger of death or serious bodily harm, such person may use reasonably necessary force to defend the family member to the same extent as the person would be entitled to use force in self-defense." *State v. Williford*, 49 Ohio St.3d 247, 551 N.E.2d 1279 (1990), paragraph one of the syllabus. A person who intervenes on behalf of another "stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force[.]" *State v. Wenger*, 58 Ohio St.2d 336, 340, 390 N.E.2d 801 (1979).

15

### a. Fault in Creating the Situation

{¶65} Smith argues that T.J. was not at fault in creating the situation because King threatened to hurt T.J. if she kicked King's car and took off her jewelry to prepare for a fight. However, there is evidence that, if believed, by the jury, would support a finding that T.J. was at fault in creating the situation. For example, the jury could have concluded that the video of the incident confirms Bryant's testimony that it was T.J. who initiated the physical confrontation. T.J. can be seen on the video reaching into the car to hit C.M. In addition, the jury could have found that Smith admitted that she knew T.J. had started the fight because as Bryant got out of her car, Bryant had told her that T.J. had struck C.M.

{¶66} The jury also could have reasonably believed Bryant's testimony that, before Smith walked into the drive-thru, "[w]e had no intentions of making anything physical, because [T.J.'s] underage and we know we're grown." Bryant testified that T.J. had not touched anyone until Smith arrived: "It's like [T.J.] got a ball of courage when her mama walked up with the gun." The jury was free to believe Bryant who said that the first physical act that occurred was when T.J. hit C.M. Therefore, the jury could reasonably have found that T.J. initiated the fight that led to Smith's committing felonious assault upon King.

### b. Bona Fide Belief of Imminent Danger

{¶67} Smith argues that she had reasonable grounds to believe and an honest belief that T.J. was in imminent danger of death or great bodily harm because King knocked T.J. to the ground and beat T.J.'s head on the concrete. However, there is evidence, if believed by the jury, that Smith did not have such a belief. For example, Smith admitted that after the shooting, she did not notice whether T.J. had any injuries to her face, and Sergeant Lind and Officer Jeremy Ohl testified that T.J. had no visible injuries. A jury could have determined after watching the video and weighing the testimony that Smith did not have reasonable grounds to believe, or a

16

subjective belief, that T.J. was in imminent danger of death or great bodily harm. *See Thomas*, 77 Ohio St.3d at 331, 673 N.E.2d 1339.

### c.  Duty to Retreat

{¶68}  A jury could also have concluded that T.J. violated a duty to retreat. For example, Smith testified that T.J. had opportunities to retreat from the drive-thru even before Smith's arrival.  Smith admitted as she watched the video that T.J. continued to provoke (looked "like she's fussing") King and Bryant as they sat in the car ordering items from an employee.  And, according to Smith, before Tamiko entered the drive-thru, T.J. had actually walked out of the drive-thru and then re-entered it.  A jury could have found that T.J. violated her duty to retreat by going back in.

{¶69}  Smith also acknowledged that she and T.J. could have left the drive-thru upon Smith's arrival.  And even after T.J. reached into the car to strike C.M., the video shows that as C.M. was getting out of the car, T.J.'s friend was pulling T.J. away from the car.  In addition, the jury could have concluded that after King broke away from T.J., T.J. could have left the drive-thru instead of going to help her friend fight C.M.  The jury could have found any of these to have been a violation of T.J.'s duty to retreat.

### Defense-of-Another Conclusion

{¶70}  Therefore, with respect to Smith's defense-of-another argument as to the felonious-assault offense, the jury could have reasonably found that T.J. was at fault in creating the situation that led to the affray, that Smith did not have a bona fide belief of imminent danger of death or great bodily harm for T.J., or that she and T.J. violated a duty to retreat.  Viewing the evidence in a light most favorable to the prosecution, we hold that the jury could reasonably have found that the state disproved at least one of the elements of self-defense with respect to the felonious-assault charge.

*Sufficiency and Weight Conclusion*

**{¶71}** Because the jury could have reasonably found that the state proved beyond a reasonable doubt that Smith did not act in self-defense or in defense of another, Smith's convictions were supported by sufficient evidence. Moreover, Smith's convictions were not against the manifest weight of the evidence. Consequently, we overrule the first, second, and third assignments of error.

*Effective Assistance of Counsel*

**{¶72}** In her fourth assignment of error, Smith argues that she was denied the effective assistance of trial counsel because counsel failed to engage a crime scene reconstruction expert and failed to argue in the alternative for voluntary manslaughter.

**{¶73}** To prevail on an ineffective-assistance claim, an appellant must demonstrate that (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). In reviewing defense counsel's performance, we must remain highly deferential. *Strickland* at 689. We must "recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. An appellant's demonstration that counsel's performance was deficient does not warrant the reversal of a conviction if counsel's error had no effect on the judgment. *Id.* at 691; *Bradley* at 142. The appellant must affirmatively demonstrate that there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *Strickland* at 693-694; *Bradley* at 143.

**{¶74}** First, Smith argues that she was prejudiced by defense counsel's failure to engage a crime scene reconstruction expert to demonstrate the sequence of events leading up to the shooting. Generally, the decision not to call an expert

18

witness does not constitute ineffective assistance of counsel because that decision is solely a matter of trial strategy. *State v. Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, ¶ 43.

{**¶75**} Nothing in the record indicates what kind of testimony a crime scene reconstruction expert could have provided, so resolving this issue in Smith's favor would be purely speculative. *See State v. Madrigal*, 87 Ohio St.3d 378, 390, 721 N.E.2d 52 (2000); *State v. See*, 1st Dist. Hamilton Nos. C-190251 and C-190252, 2020-Ohio-2923, ¶ 63. Because Smith cannot demonstrate that the outcome of the proceedings would have been different but for counsel's failure to hire such an expert, we cannot say that counsel was ineffective for failing to engage a crime-scene reconstruction expert. *See State v. McHenry*, 1st Dist. Hamilton No. C-170671, 2018-Ohio-3383, ¶ 25.

{**¶76**} Next, Smith argues that defense counsel should have argued to the jury in the alternative at trial that if the jury rejected her claim of self-defense, the jury should consider that she committed voluntary manslaughter, rather than murder.[3]

{**¶77**} Voluntary manslaughter is defined in R.C. 2903.03(A), which provides:

> No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another.

Voluntary manslaughter is an inferior-degree offense of murder because its elements are contained within the offense of murder, with the addition of one or more

---

[3] Smith does not argue that defense counsel should have requested a jury instruction on voluntary manslaughter or that the trial court erred in failing to give such an instruction.

mitigating elements. *State v. Webster*, 1st Dist. Hamilton No. C-130700, 2014-Ohio-5647, ¶ 15, citing *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992).

{¶78} This court stated in *State v. Levett*, 1st Dist. Hamilton No. C-040537, 2006-Ohio-2222, ¶ 29:

> [E]vidence supporting the privilege of self-defense—that the defendant feared for his and others' personal safety—does not necessarily constitute sudden passion or a fit of rage as contemplated by the voluntary-manslaughter statute. While self-defense requires a showing of fear, voluntary manslaughter requires a showing of rage, with emotions of "anger, hatred, jealously, and/or furious resentment." The Ohio Supreme Court has specifically held that "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage."

(Citations omitted.) In other words, self-defense requires a showing of fear for one's safety or for another's safety, whereas voluntary manslaughter requires a showing of rage or similar emotion. *See id.*; *State v. Collins*, 10th Dist. Franklin No. 19AP-373, 2020-Ohio-3126, ¶ 51.

{¶79} Here, voluntary manslaughter would have been at odds with Smith's claim that she shot King in self-defense out of fear for her safety and for her daughter's safety. The decision by defense counsel to seek acquittal rather than inviting conviction on an inferior-degree offense was a matter of trial strategy. Therefore, we hold that counsel was not ineffective for failing to argue for voluntary manslaughter. We overrule the fourth assignment of error.

### Police Officer's Opinion

{¶80} In her fifth assignment of error, Smith argues that the trial court erred by allowing a police officer to testify about when a civilian permit-holder should

draw her weapon. Smith objected to some but not all of the testimony, so we apply different standards of review.

**{¶81}** First, Smith argues that the officer should not have been permitted to testify that he would not pull his gun out in the middle of a fight if no one else had a weapon and that: "When you pull your gun out, it should be a last resort thing; whether you're a police officer or a civilian, when you pull a gun out you're introducing deadly force into the scenario." However, Smith failed to object to the officer's testimony, so we review for plain error. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 80. To prevail on a claim that the trial court committed plain error, Smith must show that (1) an error occurred, (2) the error was obvious, and (3) that it affected the outcome of the trial. *See State v. Kirkland*, Slip Opinion No. 2020-Ohio-4079, ¶ 71-72.

**{¶82}** We find no plain error in the admission of this testimony. While the officer's statements were irrelevant, they cannot be said to have affected the outcome of the trial.

**{¶83}** Next, Smith argues that the officer should not have been permitted to testify that a "firearm only ever escalates a situation. That's why it's always a last resort for police officers. When we decide to draw our weapons, it's not something that's taken lightly." Because Smith objected to the error, we apply a harmless-error standard of review. *State v. Jones*, Slip Opinion No. 2020-Ohio-3051, ¶ 18. Under the harmless-error standard, the state must demonstrate that the error did not affect the substantial rights of the defendant, that is, that the error did not affect the outcome of the trial. *Id.* Unlike the plain-error analysis, which places the burden on the defendant to show that the error affected the outcome of the trial, a harmless-error analysis places the burden on the state to show that the error did not affect the outcome.

{¶84} The officer's testimony that an officer only uses a firearm as a last resort was not relevant in this case where a civilian used a firearm. It therefore was error to allow this testimony. However, the admission of that testimony was harmless in light of the other evidence. We cannot say that the challenged testimony affected the outcome of the trial, so any error in the admission of the officer's testimony was harmless. Therefore, we overrule the fifth assignment of error.

*Sentencing*

{¶85} In her sixth assignment of error, Smith argues that the trial court erred when it imposed sentences for two firearm specifications, one for the murder and one for the felonious assault, related to a single transaction. She asserts that the court should not have sentenced her on both specifications because the murder and felonious-assault offenses were committed within the same course of conduct with the same weapon and against the same victim.

{¶86} For both the murder and felonious-assault offenses, the jury found Smith guilty of the accompanying firearm specifications under R.C. 2941.141(A) (offender had a firearm while committing the offense) and R.C. 2941.145(A) (offender displayed, brandished, indicated possession of or used the firearm). A conviction for a firearm specification described in R.C. 2941.141(A) requires a mandatory one-year prison term, and a conviction for a firearm specification described in R.C. 2941.145(A) requires a mandatory three-year prison term. *See* R.C. 2929.14(B)(1)(a)(ii) and (iii).

{¶87} R.C. 2929.14(B)(1)(b) provides that "a court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction." Generally, therefore, a court may not impose more than one sentence for multiple firearm specifications if the underlying felonies to which the specifications apply arose from the same act or

transaction. *See State v. Williams*, 1st Dist. Hamilton No. C-180588, 2020-Ohio-1368, ¶ 16. However, R.C. 2929.14(B)(1)(g) provides:

> If an offender is convicted of * * * two or more felonies, if one or more of those felonies are * * * murder, * * * [or] felonious assault * * *, and if the offender is convicted of * * * a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted * * * and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶88} Smith argues that divisions (B)(1)(b) and (g) of R.C. 2929.14 are at odds because division (b) prohibits multiple prison terms for felonies committed as part of the same act or transaction and division (g) requires the court to "do exactly that." However, courts have held that R.C. 2929.14(B)(1)(g) creates an exception to the general rule set forth in R.C. 2929.14(B)(1)(b) prohibiting multiple punishments for two or more firearm specifications arising out of a single act or transaction. *State v. Phillips*, 1st Dist. Hamilton Nos. C-150376 and C-150378, 2016-Ohio-4672, ¶ 49; *State v. Howard*, 2d Dist. Montgomery No. 28314, 2020-Ohio-3819, ¶ 91; *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 110; *State v. Hope*, 2019-Ohio-2174, 137 N.E.3d 549, ¶ 155 (11th Dist.). We said in *Phillips*:

> [T]he language of R.C. 2929.14(B)(1)(b) and 2929.14(B)(1)(g) reveals that the General Assembly enacted the latter statute to provide an exception to the general rule contained in the former, against imposing more than one penalty for multiple firearm specifications when the offender has committed certain, serious offenses.

*Phillips* at ¶ 50. Therefore, under the exception in R.C. 2929.14(B)(1)(g), the sentencing court must impose a prison term for two specifications, regardless of whether the specifications arose out of a single act or transaction. *Hope* at ¶ 157.

{¶89} Smith was convicted of two felonies described in R.C. 2929.14(B)(1)(g) and was found guilty of multiple firearm specifications (one-year and three-year specifications) described in R.C. 2929.14(B)(1)(a) in connection with each of those felonies. Because those specifications fall within those explicitly excepted from R.C. 2929.14(B)(1)(b)'s general rule proscribing multiple sentences for firearm specifications arising out of the same transaction, the trial court was required to impose the prison term specified in R.C. 2929.14(B)(1)(a) "for each of the two most serious specifications" for which Smith was found guilty, which in this case were the three-year firearm specifications. *See* R.C. 2929.14(B)(1)(a) and (g); *Howard* at ¶ 93; *State v. Adams*, 1st Dist. Hamilton No. C-120059, 2013-Ohio-926, ¶ 31. Therefore, the trial court did not err by imposing sentences for both firearm specifications. We overrule the sixth assignment of error.

## *Prosecutorial Misconduct*

{¶90} In her seventh assignment of error, Smith argues that prosecutorial misconduct during closing arguments deprived her of her constitutional rights to due process. She contends that the prosecutor degraded her by referring to her twice as "trigger-happy" and by mentioning the "Wild West." In addition, she asserts that the prosecutor improperly referred to the impact on King's family when she said, "This blood bath that the defendant caused, not only took away a loved one, the mother of that boy that left haunting images for everyone who saw it." Smith failed to object to the comments and thus forfeited all but plain error. *See* Crim.R. 52(B). We consider the state's closing argument in its entirety when determining whether the allegedly improper remarks were prejudicial. *State v. McCray*, 2017-Ohio-2996, 91 N.E.3d 288, ¶ 46 (1st Dist.).

{**¶91**} After examining the record, we cannot say that the prosecutor's comments were so inflammatory that without them, the result of the trial would have been different. *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 198. Therefore, we overrule the seventh assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**ZAYAS, P.J.,** and **CROUSE, J.,** concur.

Please note:

The court has recorded its own entry this date.